UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
CASE NO. 9:15-CV-80072-DMM


BOW DOWN, INC., a Florida
corporation,

         Plaintiff,

-vs-

MOUNT VERNON FIRE INSURANCE COMPANY,
a foreign company,

         Defendants.
_____/


DEPOSITION OF
SCOTT STEIN, A.R.M.


Tuesday, July 7, 2015
1:00 p.m. - 3:21 p.m.

Republic Executive Suites
1375 Gateway Boulevard
Boynton Beach, Florida 33426


Stenographically Reported By:
Robyn Maxwell, RPR, FPR, CLR
Realtime Systems Administrator

```
 1    APPEARANCES:

 2

 3    On behalf of the Plaintiff:
           THE LAW OFFICES OF TODD S. STEWART P.A.
 4         824 West Indiantown Road
           Jupiter, FL 33458
 5         561.743.2002
           BY: TODD S. STEWART, ESQ.
 6         Todd@TrialCounselor.com

 7

 8    On behalf of the Defendant:
           FOWLER, WHITE, BURNETT, P.A.
 9         100 Southeast 3rd Avenue
           12th Floor
10         Fort Lauderdale, FL 33394
           954.377.8107
11         BY: STEPHEN R. GROSS, ESQ.
           sgross@fowler-white.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    INDEX OF PROCEEDINGS

 2   WITNESS                                        PAGE

 3   SCOTT STEIN, A.R.M.
     DIRECT EXAMINATION BY MR. STEWART               4
 4

 5   CERTIFICATE OF OATH                            95
     CERTIFICATE OF REPORTER                        96
 6   READ & SIGN LETTER TO WITNESS                  97
     ERRATA SHEET                                   98
 7

 8                    PLAINTIFF EXHIBITS

 9     EXHIBIT            DESCRIPTION                PAGE

10       1     Handwritten Billing Time Entries      18

11       2     03/17/15 E-mail from Eleanora         19
               Ivanovski to Scott Stein, Aaron
12             Dmiszewicki, RE: 88316/Mount Vernon
               Fire Insurance Company v. Bow Down,
13             Inc., with signed Expert Witness
               Consulting Agreement attached
14
         3     Underwriting documentation and        39
15             correspondence file

16       4     Quote File                            40

17

18

19

20

21

22

23

24

25
```

```
 1   Thereupon,

 2   the following proceedings began at 1:00 p.m.:

 3              THE COURT REPORTER:  Raise your right hand,

 4         please.

 5              Do you solemnly swear or affirm the

 6         testimony you are about to give in this matter

 7         will be the truth, the whole truth, and nothing

 8         but the truth?

 9              THE WITNESS:  I do.

10   Thereupon,

11              SCOTT STEIN, A.R.M.,

12   having been first duly sworn or affirmed, was examined

13   and testified as follows:

14              DIRECT EXAMINATION

15   BY MR. STEWART:

16        Q.    Would you please state your name for the

17   record.

18        A.    Scott Stein.

19        Q.    And, Mr. Stein, what is your professional

20   address?

21        A.    5550 Glades Road, Suite 509, Boca Raton,

22   Florida 33431.

23        Q.    And what is it that you do at that

24   professional address?

25        A.    Two different things.  I own an insurance
```

```
 1   agency for the last 15 years.  And I'm also an expert
 2   witness for approximately the last eight years.
 3            Q.    Okay.
 4            A.    In the insurance field.
 5            Q.    Right.  And how do you divide your time up?
 6            A.    My split is about 65 percent insurance
 7   brokerage business, and 35 percent expert witness
 8   insurance business.
 9            Q.    And as far as your expert witness business,
10   how is it split between plaintiff and defense?
11            A.    I'm fortunate.  It's been approximately a
12   50/50 split between plaintiff and defense.
13            Q.    And when you say that 65 percent of your
14   business is a brokerage-type insurance firm, explain what
15   that means.
16            A.    Well, I have various insurance contracts
17   with insurance carriers, and I also work with wholesale
18   insurance brokers as well.  So I place property and
19   general liability insurance of various types.
20            Q.    Okay.
21            A.    The only type I don't place is auto
22   insurance.
23            Q.    And what I'm trying to get a feel for when
24   you say a brokerage firm -- in this case we have Bow
25   Down, the insured, then we have Gary Baker; and I forget
```

1    the name of his company and maybe you remember it, but --

2    and then we have Genesee General, and then we have Bow

3    Down/USLI.

4              Where do you fit into?  And really what I'm

5    thinking is those middle categories.

6         A.    Right.  So I fit into the Baker category.

7    The Genesee General would be the wholesale brokerage

8    firm.

9         Q.    Okay.  That's the term.

10        A.    And I don't fit into that in any way

11   form -- or form.

12        Q.    Do you have to have a special license or

13   qualifications, which is why you would say that you don't

14   fit into that category?  Or is there just you choose not

15   to do that kind of work or some other reason?

16        A.    Well, I choose not to do it.  You typically

17   find in the insurance business that people are either

18   what we would -- we term brokers, where they're

19   wholesalers in terms of placement of insurance, not both

20   at the same time.  Once in a while you'll find a few

21   carriers -- a few brokers that are doing wholesale

22   business as well.

23              But to answer your question:  Do you need a

24   special license; you typically need an excess and surplus

25   lines license to place the wholesale business.  So I

1    don't have an excess and surplus lines license.

2         Q.    What licenses do you hold?

3         A.    I hold two licenses.  I hold a

4    2-20 license, which is a property and casualty insurance

5    license, and I also hold -- and they've changed the

6    numbers, so I apologize for it in the State of Florida --

7    it's either 2-15 or 2-18, a life and health license, as

8    well.

9         Q.    But the license that would qualify you to

10   sell the type of insurance we're dealing with in this

11   case is a 2-20?

12        A.    That's correct.

13        Q.    And in -- you said how many years you've

14   had your firm and I didn't write it down.

15        A.    Since the year 2000.

16        Q.    2000.  You said eight years doing the

17   expert witness work, but I didn't get the --

18        A.    Approximately eight years.  That's correct.

19        Q.    All right.  So give me just a rundown of

20   your educational background, please.

21        A.    Sure.  I went to George -- well, I'm not

22   going to start with high school, unless you want me to

23   start with high school.

24        Q.    I want to know where you went to

25   kindergarten, and what grades did you make.

1          A.    I -- I went to George Washington University

2    in Washington, D.C.  I graduated with a BBA in finance in

3    1984.  I was on the Dean's list the entire time that I

4    was there.

5          **Q.    Okay.**

6          A.    Then I became a, in terms of educational,

7    I -- I was a stockbroker for a period of time working on

8    Wall Street in New York, and made a decision that few

9    people make; to purposefully go into the insurance field,

10   which I did in 1993.  And my educational background in

11   the insurance field is that I have obviously passed the

12   examinations for my licenses, but I also have an

13   associate in risk management designation -- A.R.M.

14   designation -- from the Insurance Institute of America in

15   Malvern, Pennsylvania.

16         **Q.    Do you recognize the Insurance Institute of**

17   **America as an authoritative source on insurance matters?**

18         A.    Very much so.  They also are involved in

19   handling a CPCU as well.  So they're very much a higher

20   source in the subject matter of insurance.

21         **Q.    What's a CPCU?**

22         A.    Certified Property Casualty Underwriter.

23         **Q.    And is that what your designation is?**

24         A.    I do not have that.  It takes

25   approximately -- it can take approximately five plus

1    years to get that.  It involves ten different courses.

2        **Q.    You've been practicing in your own firm**

3    **since 2000.  You've been in the insurance field since**

4    **'93.  Any reason why you haven't gotten that**

5    **certification?**

6        A.    I keep thinking about it, but I really

7    haven't -- I haven't -- I haven't done that.  There's no

8    particular reason why I've not done that.  There's

9    certain areas in it that I am not interested in, such as

10   taxation and law, and other components of it that I

11   didn't feel were appropriate.  I felt the A.R.M.

12   designation was the most appropriate one for me.

13       **Q.    And what is the qualifications for an**

14   **A.R.M.?**

15       A.    Three different courses, typically over

16   about an 18-month period.  You need to pass each

17   course -- a test for the course, and ultimately then you

18   are awarded the A.R.M. designation.  It involves things

19   like fundamentals of finance related to insurance and

20   other types of -- there's two other courses related to

21   insurance and related matters, and types of insurance

22   that are available.  And there's one other course I don't

23   recall.  It was some time ago.

24       **Q.    Is there a test?**

25       A.    There is a test.  There's actually three

1    tests.  So you take a test for each one of the courses

2    that you take.  There's a very large book for each

3    course -- for each, excuse me, for each one of the -- one

4    of the three courses in the -- in the -- for the exam.

5    You take the exam for each one of those.  And once you've

6    passed your third one, you then are awarded the A.R.M.

7         Q.    Where is the Insurance Institute of America

8    located?

9         A.    For some reason I believe that it's

10   Malvern, PA.

11        Q.    Does the Insurance Institute of America

12   issue -- I don't know whether you call them policy

13   directives or memorandums of coverage, those kinds of

14   things?

15        A.    I've never seen one from the Insurance

16   Institute of America.

17        Q.    You've seen them from other organizations,

18   correct?

19        A.    I've seen things fairly related to that

20   from, say, the Florida Association of Insurance Agents,

21   FAIA.

22        Q.    Dealing with the issues in this particular

23   case, have you seen any -- what would you call them?  I

24   called it a memorandum of coverage, you know, a bulletin,

25   an alert.  What would you call it where an organization

1    would issue a -- some kind of statement on a particular

2    area of insurance?

3            A.    I know I was asked for that --

4                  MR. GROSS:  Form.

5            A.    -- in -- in my -- what I'm supposed to

6    bring today, and I've not seen any -- any documents

7    whatsoever in that regard.

8    BY MR. STEWART:

9            Q.    That deal with the issues in this case?

10           A.    That's correct.

11           Q.    Okay.  Have you -- speaking of the issues

12   in this case, as part of your professional insurance

13   practice since 1993, have you sold policies similar to

14   this one?

15           A.    Very much so, yes.

16           Q.    Okay.  For instance, a policy that had an

17   exclusion for a mechanical device or a riding device?

18           A.    Often, yes.

19           Q.    An exclusion dealing with athletics -- I'm

20   sorry, athletic activity, physical activity or sport?

21           A.    That's a common exclusion.  Yes, that's

22   correct.

23           Q.    And you've also sold policies with an

24   exclusion with regard to trampolines or rebounding

25   devices?

1          A.     Yes, I have.

2          Q.     **Okay.  And have you always interpreted**

3   **those exclusions the way that you have interpreted them**

4   **here today for this opinion -- the opinions that you**

5   **have?**

6          A.     Yes.  In my -- yes, as I have in my report.

7          Q.     **Now, you were asked to bring some materials**

8   **with you today, and I know we had some objections as**

9   **well.  What did you bring here with you today?**

10         A.     Sure.  I brought, number one, my CV, which

11   is also in my report, which you've seen.

12         Q.     **Right.**

13         A.     And I had a little bit of trouble

14   understanding this, but "copies of all statements written

15   or recorded that you have examined."  Basically, I

16   brought my entire file with me.

17         Q.     **Okay.**

18         A.     And so, I consider that to be -- I consider

19   that to be the -- the copies of the statements that I've

20   reviewed.

21         Q.     **I know that you listed materials that you**

22   **reviewed at the beginning of your report.  Have you**

23   **reviewed any additional materials since?**

24         A.     These two --

25         Q.     **Okay.**

13

```
 1          A.     -- that I received earlier.  I'd say --
 2                 MR. GROSS:  We gave him that a half an hour
 3          before this depo.
 4   BY MR. STEWART:
 5          Q.     Okay.
 6          A.     But that's the only thing that I've seen
 7   that I've reviewed.
 8          Q.     Have you incorporated these into your
 9   opinions?
10          A.     Not at all.
11          Q.     What we're referring to when we say "these"
12   is Docket Entry 68 and Docket Entry 69 in this case, the
13   Statement of Material Facts, as well as the actual Motion
14   for Summary Judgment filed by Mount Vernon.
15                 Okay.  So everything else, other than to
16   those two items, are the items listed in your report,
17   correct?
18          A.     Let me put my glasses back on.
19          Q.     Sure.
20          A.     So as we see -- I'll just go through them
21   as I -- I've checked off each one of them for you, if
22   that will be helpful.  I'll go through them very quickly.
23          Q.     Sure.
24          A.     Number 3:  There were none.
25                 Number 4:  There were none, or I wrote
```

```
 1    "N/A."

 2              Number 5:  There were none.

 3         Q.    Let me just slow you down for just a

 4    second.  Okay?

 5              Okay.  So in response to Number 4, you have

 6    not professionally drafted speeches or given speeches?

 7         A.    I have not.

 8         Q.    Okay.  Keep going.

 9         A.    So Number 5:  I do not have copies of any

10    of the depositions.  Obviously, they're available if they

11    were filed with the Court, but I don't have copies of

12    them because, as all of my attorneys have asked me to do,

13    is destroy the file after a certain period of time.

14         Q.    Okay.

15         A.    So I don't have any of my depositions.

16         Q.    Okay.

17         A.    Then Number 6:  The report relating to the

18    expert opinion in this case, I -- I --

19         Q.    Provided it.

20         A.    -- I provided that.

21         Q.    Yep.

22         A.    Number 7:  "All notes, calculations, and

23    other data prepared by you in formatting your opinions."

24    I have -- all I have are -- you'll see in here, and I'm

25    happy to show you the entire file, is please -- please
```

1   speak to the attorney about this or please speak to the

2   attorney about that.  That's basically all it says in

3   there.

4        **Q.    Your wrote a note to yourself that I need**

5   **to speak to the attorney about something?**

6        A.    Yes.  Yes.

7        **Q.    All right.**

8        A.    They all here in the file.  They're just

9   Post-It notes.  They are attached to particular pages.

10       **Q.    Okay.  Keep going.**

11       A.    Number 8:  There are no drawings, or

12  graphs, or illustrations, or charts.

13            Number 9:  "Your records indicating time

14  spent" -- and I must apologize.  I thought that I had

15  made a -- and I'd like -- if I give this to you, I'd like

16  a copy of it back.  It's my time that I've spent on the

17  case so far prior to today.

18            But typically, what I do is I send out a

19  formal version of that to the attorneys for payment.  But

20  I thought I had sent that out and I never did.  So I only

21  have a handwritten copy of it.

22       **Q.    Okay.  Why don't you just read into the**

23  **record everything that you did, starting with the date,**

24  **and give me what you did and how much time it took.**

25       A.    I will.

1          Q.      Thank you.

2          A.      On 3/26/15:  Read complaint, from 3:15 to

3     4:15.

4                  On 3/27/15:  Continue read complaint, from

5     11:00 to 11:30, 1:30 to 1:45, and policy.

6                  Read plaintiff's motion for remand, from

7     2:00 to 2:45.

8                  On 3/29/15:  Continue read plaintiff's

9     motion for remand, 11:30 to 12:00, 1:30 to 3:00.

10                 On 3/30/15:  Review the underwriting file,

11    from 11:30 -- excuse me, from 10:30 to 11:15.

12                 I wrote "reviewed cancellation," but I

13    didn't write -- I didn't write the times next to that.

14                 Reviewed the claim file, from 11:45 to

15    12:00.

16         Q.      Same date?

17         A.      Yes, on 3/30/15.

18         Q.      Okay.

19         A.      On 4/23/15:  Review the answer and

20    affirmative defenses and counterclaim to plaintiff's

21    complaint, from 3:15 to 3:45.

22                 And on 4/24/15:  The same thing, which is

23    review the answer, affirmative defenses and counterclaim

24    to plaintiff's complaint, finish it, from 1:15 to 2:15.

25                 On 5/21/15:  Read expert report, from 12:00

17

1    to 12:30.

2              On 5/22/15:  Discussion with attorneys,

3    re:  Expert report, from 10:00 to 10:15.

4              On 5/30/15:  Discuss with attorney my

5    expert report, from 4:00 to 4:15.

6              On 6/2/15:  Go over papers and notes for

7    draft expert report, from 10:30 to 11:30, and then from

8    1:30 to 3:00.

9              On 6/3/15:  Again, go over papers and notes

10   and draft expert report, from 11:00 to 12:00, 2:00 to

11   2:45, and 3:00 to 3:30.

12             On 6/14/15:  Prepare the expert report,

13   from 10:00 to 11:15, 1:00 to 2:00, 2:30 to 3:00, 3:30 to

14   4:00, 4:15 to 4:45, and 6:15 to 6:45.

15             On 7/2/15:  Meeting with attorneys

16   before deposition at their office.  I just wrote two

17   hours.

18             On 7/6/15:  Prep for deposition, 9:00 to

19   11:00, and 1:00 to 3:30.

20             That's it.

21        Q.    Okay.

22        A.    I'm happy to give you a copy of this, if

23   you'd like a copy.

24        Q.    I think we're sufficient there.  Obviously,

25   we're not.  As I was saying no, I'm seeing her nodding

```
 1    yes.  So we'll attach that as Number 1.

 2                  (Plaintiff Exhibit No. 1 was marked.)

 3           A.    As long as I can have that copy back after

 4    that.

 5    BY MR. STEWART:

 6           Q.    And so your total time in this case, it

 7    looks like...

 8           A.    I didn't add up the bottom part.

 9           Q.    That's what I'm doing right now.

10                 I come up with 22.5 hours.  17 plus 2 plus

11    2 plus 1.5.  Does that sound right so far?

12           A.    Yes.

13           Q.    And you charge how much per hour?

14           A.    $300 per hour.

15           Q.    I want to put that over here, just because

16    what happens is it gets lost in the shuffle and then you

17    go home with it.

18                 Okay.  We're continuing on.  You're up to

19    Number 10, unless there's was anything else on 9.

20           A.    Not on 9.

21           Q.    Okay.

22                 MR. GROSS:  And if I could just real quick,

23           this is subject to our objections.

24                 MR. STEWART:  Okay.  I didn't know which

25           ones -- I forgot which ones you objected to.
```

```
 1              MR. GROSS:  Six and something.  So he's

 2         already -- I mean, he's producing part of subject

 3         to our objections.

 4              MR. STEWART:  Okay.

 5              MR. GROSS:  Go ahead.  I'm sorry.

 6         A.    I believe I had the other expert report

 7    with me, but I don't have it with me today, from your

 8    expert.

 9    BY MR. STEWART:

10         Q.    From our expert?

11         A.    Yes.

12         Q.    I think this one's more geared towards

13    multiple experts on one side.

14         A.    No, I don't have -- I don't have any

15    others, but I apologize I didn't -- I didn't bring your

16    expert report.

17         Q.    Okay.

18         A.    I did bring the correspondence between

19    Number 12.

20         Q.    Yeah.

21         A.    The only things that they've sent to me or

22    that we've sent to each other.  Oh, and this.

23         Q.    I'll go ahead and mark your consulting

24    agreement with the e-mail as 2.

25              (Plaintiff Exhibit No. 2 was marked.)
```

```
 1   BY MR. STEWART:

 2        Q.   So this is all the materials that you were

 3   provided that you listed in your report on this little

 4   thumbnail drive?

 5        A.   That's correct.  I asked for actually

 6   everything on paper, but they supplied it to me and the

 7   thumb drive as well, and I decided to use the paper

 8   because I preferred it.

 9        Q.   Okay.  And what was the date of that that

10   they supplied those to you?

11        A.   March 23, 2015.

12        Q.   Okay.  Fair enough.  Just keep going.

13        A.   Number 11 is N/A.

14        Q.   Okay.

15        A.   I'm sorry, Number 12.  I just showed you

16   the correspondence between us.

17        Q.   Right.  Right.  But Number 11 is still

18   none, correct?

19        A.   That's correct.

20             Number 13 is N/A.

21             Number 14 is N/A.

22             Number 15 is N/A.

23             Number 16 is actually located in the file,

24   which is the photographs that I reviewed of the lake.

25        Q.   Which would have been part of the police
```

1   report?

2        A.    Yes, that's correct.

3        Q.    **Is that it as far as photographs?**

4        A.    That's it.  That's the only photographs

5   that I've seen.

6        Q.    **Okay.**

7        A.    And Number 17 is N/A as well.

8        Q.    **I'm turning my attention to your report,**

9   **but really just for the documents that you reviewed.  I**

10  **noticed something that you called "Number 11 Policy**

11  **Cancellation Document."**

12            **What is that?  You list it as Number 11.**

13       A.    As I recall, I believed I had seen

14  something that was a cancellation of the actual policy

15  itself.  And I don't remember where that's located, but I

16  believe that there was a cancellation notice from the

17  carrier.

18       Q.    **Okay.**

19       A.    I think it may have been for a prior -- for

20  a prior year, if I remember correctly.

21       Q.    **Okay.  What about the Quote File, 10, item**

22  **Number 10 on your list?**

23       A.    I can show that to you if you'd like to see

24  that.

25       Q.    **Why don't you just pass over to me**

1    everything you have and I can pull that out while you're

2    doing it.  It may be easier.

3              So are these in numbered order?

4        A.    No.  That would have been too easy.

5        Q.    How am I going to find Number 10?

6        A.    The Quote File is really simple.  It's

7    listed as "Quote File" in blue, in the back here.  I

8    don't remember where.

9        Q.    Okay.  I find it then.

10       A.    It's not that one, but one of these.  It

11   will say "Quote File."

12       Q.    Okay.  These materials were provided to you

13   by the lawyers for Mount Vernon?

14       A.    That's correct.  Yes.

15       Q.    Okay.  And this is the manner that they

16   were provided to you in?

17       A.    I think they did a nicer job of providing

18   them to me, but, yes, they were provided to me in a box,

19   as well as also on a thumb drive.

20       Q.    And this is their handwriting?

21       A.    Yes, it is.

22       Q.    In other words, the little stickies --

23       A.    The -- the -- I should tell you the -- if

24   you flip to the first page where the -- where the X is,

25   that means that I've reviewed the information.

1          Q.     Okay.

2          A.     So in the same way that we have here, you'd

3    see a check mark with the yellow -- a yellow on it, like

4    a highlighter.  That's -- that's me saying that I've read

5    everything in there.

6                 MR. GROSS:  Just for clarity, I think the

7          question is:  The blue piece of paper; is that

8          something we provided you or is that something you

9          added yourself to that document?

10         A.     You -- the attorneys provided the blue

11   piece of paper for me.

12   BY MR. STEWART:

13         Q.     The headers of what?  The sections?

14         A.     Everything, yes.

15         Q.     And who did the highlighting on these?

16         A.     I did the highlighting on everything.

17         Q.     Okay.  Now, you reviewed something called

18   the Plaintiff's Motion for Remand and Incorporated

19   Memorandum of Law, correct?

20         A.     That's correct.

21         Q.     Document 5 in this case.  And you've got a

22   sticky on Page 4, but with no note on it.  Any particular

23   reason?

24         A.     Not that I recall.

25         Q.     Okay.  And then have you've got a sticky on

1    Page 5.  "Report and two endorsements" -- I'm not sure --

2    I can't right quite read it.  And you may not be able to

3    read it upside down.

4         A.    I was going to put that in the report.

5    This is something that I would put in my report, and

6    there were two endorsements that were listed there.

7         Q.    I see.  So just you were using this for the

8    purpose of recognizing there were two endorsements?

9         A.    That's correct.

10        Q.    And then a third --

11        A.    As -- as I went through each one of those.

12   That's correct.

13        Q.    And a third one on Page 6 of that document?

14        A.    Yes.

15        Q.    And then you've got a star next to

16   something called "Exclusion Mechanical Rides."  Any

17   reason that there's a star, other than it's an except --

18   it's an exclusion that's being claimed in this case?

19        A.    It would be an exclusion that I saw myself,

20   that I believed what I wanted to investigate further and

21   figure out whether it was a termination, whether --

22   remember, I only -- I was reading this -- these

23   documents, I believe, in the order that -- that we're

24   looking at right now.  So I didn't have all of the

25   information and I wanted to get all of the information

1    read before I drew any conclusions whatsoever.  So that

2    was just a way to mark it.

3          Q.    Okay.  There's a sticky on the exclusion

4    regarding participation in athletic activities, physical

5    activity or sports.

6                MR. STEWART:  And by the way, they didn't

7          do this right in the last deposition.  It is

8          "athletic activities, physical activities or

9          sports."  No comma.  And they keep putting the

10         comma in, because that's how I think that -- how

11         they speak -- how we speak.  But anyway, they may

12         not have realized what we were doing.

13   BY MR. STEWART:

14         Q.    There's a sticky next to this one that

15   says:  "Discuss with Aaron our -- or "and Mr. Gross.

16   Super critical."

17               Is that -- did I read that correctly?

18         A.    That's correct.

19         Q.    Why is that super critical?

20         A.    Because as I wrote in my report, I believed

21   that Mr. Reed was -- or O'Quan Reed was swimming, and

22   that there was an absolute exclusion on this policy for

23   anything related to sport or athletic activity or

24   physical activity.

25         Q.    Okay.  So that's why that's super critical?

 1          A.    Yes.

 2          Q.    And then you've got a sticky next to Page,

 3    it looks like 7 of 16 of some policy regarding medical

 4    payments Coverage C.  Is that because it discusses

 5    athletics?

 6          A.    It does.

 7          Q.    And is that why you have a sticky?

 8          A.    I do.

 9          Q.    Okay.  Then you've got a sticky next to --

10    again, that same mechanical ride exclusion, on a

11    different page.

12                Any reason why it was tagged twice, other

13    than it's one of the exclusions that we're discussing in

14    this case?

15          A.    No.  Unfortunately, you'll see that as you

16    go through the rest of these, that I've -- that I've

17    tagged many of things over and over again.  That's my way

18    of remembering.

19          Q.    Okay.  And then you've got a sticky that

20    says:  "Not applicable to this case.  Trampoline or

21    rebounding device exclusion."

22                Why is it that you felt like the trampoline

23    or rebounding device exclusion was not applicable to this

24    case?

25          A.    Well, it was before I figured out what,

1    ultimately, a zip line does.  But I've realized a

2    trampoline -- well, he wasn't on a trampoline when he

3    drowned.  That's very clear.  We all know that.

4              And, but I didn't understand what a

5    rebounding device was at that time until I began to

6    understand what -- what, you know, what happens on a

7    rebounding device, where it goes from one place to

8    another and back and forth.  So then that's why I listed

9    it that way.

10         **Q.    You can see that that's your weakest**

11   **argument in this case, correct?**

12              MR. GROSS:  Form.

13         A.    I wouldn't say it's the weakest argument.

14   I would say that there are stronger arguments.

15   BY MR. STEWART:

16         **Q.    I'll let you explain to the Judge the**

17   **difference between that, those two statements, but be**

18   **that as it may.**

19              **You've been in the insurance field since**

20   **1993.  So over 20 years?  Am I doing the math right?**

21         A.    I'm -- I'm almost getting towards 23, yes.

22         **Q.    Towards 23.  Okay.  And in all that time,**

23   **you haven't had to deal with the definition of**

24   **"rebounding device"?**

25         A.    Not in terms of a loss itself, I've not had

1    that come up before, no.

2          Q.    In terms of a loss itself, have you dealt

3    with the issue of athletic activity, physical activity or

4    sport?

5          A.    Yes.

6          Q.    And on how many occasions?

7          A.    Probably three occasions over my career.

8          Q.    And on those three occasions did the

9    exclusion preclude coverage?

10         A.    On every one it did, yes.

11         Q.    What were the three events?  How was the

12   person injured?

13         A.    One was, I believe, playing a baseball

14   game.  One was playing a soccer game, if I remember

15   correctly.  Football, like -- I forget how you call it,

16   but a football where everybody kind of gets together and

17   plays a --

18         Q.    A flag football game?

19         A.    A flag football game, yes, a flag football

20   game.

21         Q.    Okay.  And then the last exclusion, have

22   you dealt with claims made on the mechanical or that

23   were -- that there was an issue of whether there was a

24   mechanical ride or riding device?

25         A.    No.

```
 1            Q.    Okay.  Did I get the words right?  I mean,

 2    I don't want to mince words with you.

 3            A.    You did.  You did.  That's correct.

 4            Q.    Okay.  Sometimes it's -- it's called

 5    mechanical ride or riding device.  I sometimes say

 6    mechanical device.  But anyway, you know what I mean.

 7            A.    Yes.

 8            Q.    Okay.  And then you've tagged the "athletic

 9    activity, physical activity or sports."

10            Again, any other reason why it's tagged

11    again, other than it showed up again?

12            A.    Well, I believe that that was a prevalent

13    activity that Mr. Reed was involved in at that time, was

14    swimming or physical activity.  So that's why -- you'll

15    see I've flagged that again and again.  So you'll see

16    that further more.

17            Q.    And then the last tag says:  "Not

18    applicable as" something "in my opinion."  I can't quite

19    read it.  I'm sorry.

20            A.    "As defense in my opinion."

21            Q.    And "defense" meaning?

22            A.    As in writing my report or thinking about

23    what was going on here.  That was having to do with the

24    way that the rebounding was written, and we discussed

25    that just a few moments ago.
```

1          Q.    Okay.  And, again, that's the climbing,

2     rebounding, and interactive games and device exclusion,

3     correct?

4          A.    Yes, it is.

5          Q.    Okay.  In the binder, if you will, or clip

6     that's titled "Underwriting" you have some -- some

7     stickies.

8               On the first one you have a sticky on a

9     memorandum from USLI to Genesee, G-E-N-E-S-E-E, General,

10    from Kristy Mitchell at USLI and it discusses -- it looks

11    like maybe it's an e-mail or some communication

12    method where they're following up on items that still

13    need to be answered, and you have a sticky on it

14    called -- that says "discuss."

15              Is that because of the highlighted term

16    "water hazards"?

17         A.    Yes.

18              MR. GROSS:  Form.

19    BY MR. STEWART:

20         Q.    Anything else with regard to this note that

21    you felt like you needed to discuss?

22         A.    There may have been something in there

23    about overnight camping, but I don't recall.

24         Q.    That didn't make it into your report or

25    opinions, correct?

```
 1          A.     It did not.  No, it did not.

 2          Q.     And "discuss" means --

 3          A.     I apologize, but can I ask you to put the

 4   air on again, maybe.

 5                 MR. GROSS:  I can go.

 6          A.     I'm sorry.  It just keeps getting shut off.

 7                 (Brief recess.)

 8   BY MR. STEWART:

 9          Q.     Okay.  My question was:  Is this note to

10   discuss, meaning you need to discuss it with the

11   attorneys?

12          A.     That's correct.

13          Q.     And what was it about water hazards that

14   you felt like you needed to discuss with the attorneys?

15          A.     That -- if I recall, they did not answer --

16   I'm talking about Bow Down did not answer on their

17   application the response as to water hazards or not.  In

18   other words, they had that circled, "water hazards."

19          Q.     Do you have the application actually

20   separated out?  Do you know?

21          A.     It's somewhere in this file.  I hate to say

22   it that way.

23                 Do you know where would it be?

24          Q.     I thought it would be in the claim file,

25   but maybe the quote?
```

1            MR. GROSS:  Quote or maybe Underwriting.

2            MR. STEWART:  Yeah, I don't -- I don't see

3        something called Underwriting, unless --

4            MR. GROSS:  That's what it is.

5            MR. STEWART:  All right.  That's where I

6        am.

7            MR. GROSS:  This looks like Quotes.

8            MR. STEWART:  You don't have any Bate

9        stamps?

10            MR. GROSS:  Unfortunately, no.  That was

11        before production.

12  BY MR. STEWART:

13        **Q.    All right.  Why don't you show me in this**

14  **document -- this clip, which is yours, that's called**

15  **"Underwriting," where the application is.**

16            **I'm looking for an actual application that**

17  **is signed by Bow Down.**

18            **You wouldn't rely on an unsigned**

19  **application, would you?  Sir, that's my question.**

20        A.    No.

21        **Q.    Okay.**

22        A.    But I would rely upon what an insured told

23  me to tell an insurance carrier from a primary

24  application.

25            I don't have that.

1          Q.    Okay.  So, as we sit here, you have

2     formulated opinions in which -- strike that.

3               You have formulated opinions in this case

4     without having a signed application from Bow Down,

5     correct?

6          A.    I have --

7               MR. GROSS:  Form.

8     BY MR. STEWART:

9          Q.    I didn't hear you.  I'm sorry.

10         A.    Oh, wait.  Yes, I have.

11         Q.    You have seen --

12         A.    No, I have -- you -- you are correct.

13         Q.    Okay.  In your report, you have indicated

14    that there were material misrepresentations by Bow Down

15    to either Mount Vernon or USLI, however you want to

16    phrase it.  Is that based upon the unsigned application?

17              MR. GROSS:  Form.

18         A.    Yes, it is.

19    BY MR. STEWART:

20         Q.    Okay.  And why did you rely upon an

21    unsigned application?

22         A.    Because nobody ever produced me a signed

23    application.

24         Q.    Okay.  When you realized that you did not

25    have a signed application -- well, let me ask that

1    question first.

2              Did you ever realize you didn't have a

3    signed application?

4         A.    I realized I had, I believe, a supplemental

5    signed application.  I can't remember which one it was,

6    whether I had the primary application signed or the

7    supplemental application signed, but one of those two

8    applications was signed by Bow Down.

9         Q.    Okay.  Were you able to find that in the

10   materials that you just looked at?

11        A.    I don't recall.

12        Q.    Do you want to look at it again?

13        A.    No.

14        Q.    You don't recall seeing it in here, do you?

15        A.    No.

16        Q.    So, as we sit here today, you have not

17   reviewed any documents that were signed by Bow Down,

18   correct?

19              MR. GROSS:   Form.

20        A.    Correct.

21   BY MR. STEWART:

22        Q.    Now, this first sticky note on the

23   January 28, 2011 memorandum from Genesee General to Adam

24   Forrester -- I'm sorry -- to Adam Forrester at Genesee

25   General from Kristy Mitchell at USLI, it indicates that

1   they need some answers to some questions related to the

2   policy or the binder?

3          A.     The policy.

4          Q.     Sir, I'll ask you to read what this first

5   sentence says after "we need your help," and tell me

6   whether or not the information that person was trying to

7   gather related to the binder.

8          A.     "Thank you for the order to bind on this

9   account.  As indicated on our quote, the following is

10  required prior to binding."

11         Q.     All right.  So that would be information

12  that they were seeking in order to prepare the binder,

13  correct?

14         A.     Yes.

15         Q.     All right.  With regard to water hazards,

16  did you make any effort at all to research the definition

17  of the term "water hazards"?

18         A.     No, I did not.

19         Q.     Okay.  Why not?

20         A.     Because I believed I understood what a

21  potential water hazard was.

22         Q.     Well, it doesn't say "potential water

23  hazard," it says "water hazard," correct?

24         A.     Yes.

25         Q.     All right.  Do you play golf?

```
 1              A.     Infrequently, but yes.

 2              Q.     All right.  More often than I do.

 3                     Do you understand the term "water hazard"

 4       when it refers to a golf course?

 5              A.     Yes.

 6              Q.     Now, this also talks about firearms and

 7       hunting.  Do you have any information that the folks at

 8       Bow Down who went out there were going to participate in

 9       firearms or hunting?

10              A.     None at all.

11              Q.     And with regard to overnight camping; is

12       the risk that is being insured against the issues that

13       can arise when someone sleeps outdoors, for instance, in

14       a tent?

15              A.     Yes.

16              Q.     Any others?

17                     MR. GROSS:  Form.

18              A.     Wild animals.

19       BY MR. STEWART:

20              Q.     Well, that would be a risk of sleeping

21       outdoors.

22              A.     Yes.

23              Q.     The risk is you're outdoors and you're

24       exposed to whatever is out there?

25              A.     That's correct.
```

```
 1          Q.     Nothing else that you can think of?

 2          A.     No.

 3          Q.     Okay.  Moving on through your underwriting

 4   binder, if you will, or section, once again, we have an

 5   e-mail from, it seems like the same date,

 6   January 28, 2011 -- yeah -- and it asks to -- its from

 7   Kristy Mitchell, same person as the one we just -- the

 8   memorandum that we just discussed.  It's sent to Paula

 9   Price, instead of Adam Forrester like the previous one.

10   And it has some questions that it is asking, correct?

11   Just so we can...

12          A.     Yes, that's correct.

13          Q.     And I'm trying to finish my question,

14   because it started to get long.

15                 Included in those you've highlighted "water

16   hazards."  Same reason?

17          A.     Yes, that's correct.

18          Q.     Okay.  And it looks like Paula Price is

19   with Genesee General, correct?

20          A.     Yes, it seems exactly that way.

21          Q.     Okay.  So once again, this is a

22   conversation going on between USLI and the -- what did

23   you call them?

24          A.     The wholesale brokerage firm.

25          Q.     Wholesale brokerage firm, discussing the
```

```
 1    issues about this policy, correct?

 2         A.    Yes, that's correct.

 3         Q.    No discussion with Gary Baker's office or

 4    Bow Down about these issues, correct?

 5              MR. GROSS:  Form.

 6         A.    Not that I was given information about.

 7    BY MR. STEWART:

 8         Q.    Okay.  And you also have a sticky next to

 9    an unsigned United States Liability Insurance Group

10    Supplemental Application.  And it looks like somebody

11    started to fill it in.  And you have highlighted "off

12    premises activities" and "day trips."

13              Is that because you felt like both of

14    these, both of these -- is that because you felt like

15    this event qualified as both an off premise activity and

16    a day trip?

17              MR. GROSS:  Form.

18         A.    Yes, I did.

19    BY MR. STEWART:

20         Q.    Okay.  Sir, the question that starts out

21    with all of the categories is:  "Circle all services that

22    apply," and then it says:  "Provide detail for each."

23              Tell me what that means.

24              MR. GROSS:  Form.

25         A.    Well, if you were going to an amusement
```

1  park, as an example, and you would call that a day trip.

2  So a day trip you might write next to it a trip to an

3  amusement park or something like that, or a trip to the

4  zoo, or something to that effect.

5  BY MR. STEWART:

6      Q.   Okay.  I'm focusing on the word "services."

7  What does that mean to you in the insurance business on

8  an application?

9      A.   I'm having a tough time with the word.

10  I -- I look at it more as an activity as opposed to a

11  service.

12      Q.   You think that in this application it would

13  have been clearer if it had said "circle all activities

14  that apply and provide details for each"?

15          MR. GROSS:  Form.

16      A.   Yes.

17  BY MR. STEWART:

18      Q.   Okay.  All right.  We'll go ahead and mark

19  this as three.  And then...

20          (Plaintiff Exhibit No. 3 was marked.)

21  BY MR. STEWART:

22      Q.   All right.  Moving on to the quote section,

23  you've got something in here where you've highlighted

24  under the quote -- let me keep it all together.

25          Is this document what you would consider

1   the quote?

2          A.    This would be the quote from USLI to

3   Genesee General.   It's not the actual quote to Bow Down,

4   Incorporated.

5          Q.    Did you ever see an actual quote to Bow

6   Down?

7          A.    Not that I recall.

8          Q.    You would expect to see that, wouldn't you?

9          A.    Yes.

10          Q.    So the documents -- and I'll be happy to

11   let you go through them -- that you have in the section

12   called "Quote" that we'll mark as Number 4, those are

13   documents passed between either USLI or Mount Vernon and

14   on the other hand, Genesee General, correct?

15                And take your time.   You have a few to

16   review.

17          A.    Yes, you are correct.

18          Q.    And go ahead and put that back together and

19   stick it right over here so that the court reporter can

20   have it.

21          A.    I think I flipped it upside down.

22                (Plaintiff Exhibit No. 4 was marked.)

23   BY MR. STEWART:

24          Q.    Sir, you would agree -- well, isn't it true

25   that if Mount Vernon wanted to exclude zip lines

```
 1    specifically, they could have written "zip lines" in
 2    their policy, correct?
 3                    MR. GROSS:  Form.
 4         A.    They could have written that as a
 5    particular exclusion; that's correct.
 6    BY MR. STEWART:
 7         Q.    And they chose not to do that, correct?
 8         A.    It's not in there, so you -- you are
 9    correct.
10         Q.    If they wanted to exclude swimming, they
11    could have done that, correct?
12                    MR. GROSS:  Form.
13         A.    I think that's a very different instance.
14    I think that you would have to list all of the different
15    particular sporting activities that exist, and then list
16    swimming as one of those activities.  You could list
17    baseball, football, soccer, golf, or hockey or -- you
18    could go on and on and on -- you know, Ping-Pong,
19    swimming.
20    BY MR. STEWART:
21         Q.    All of the activities you've listed, other
22    than swimming, are activities that are done in a
23    competitive way, regardless of -- well, scratch that.
24                    All of the activities that you have listed
25    are activities that are done in a setting where there are
```

1    teams competing against each other, correct?

2         A.    Not always, no.  Like, for example, in

3    golf, people play golf by themselves sometimes where

4    they're not competing against anybody but themselves.

5         Q.    There's still a competition going on,

6    correct?

7         A.    Yes.

8         Q.    Swimming doesn't necessarily have to be a

9    competition, correct?

10        A.    No, it does not.

11        Q.    Someone can be swimming and not

12   participating in a sport, correct?

13        A.    I think swimming is considered a sport.

14        Q.    That's not what I asked you.  I asked you

15   whether or not someone swimming is always a sport.

16        A.    I don't understand the term "sport" then.

17        Q.    That's a good admission.

18              As an insurance broker since 1993, you have

19   never come to an understanding of what the word "sport"

20   means?

21        A.    I have, and I consider swimming to be a

22   sport.

23        Q.    Okay.  So any time someone is in the water

24   and treading water, they are at -- they are participating

25   in a sport, in your definition?

```
 1                    MR. GROSS:  Form.
 2          A.    Yes, they are, as well as in a physical
 3     activity.
 4     BY MR. STEWART:
 5          Q.    I didn't ask you about a physical activity.
 6     We'll get to that in a minute.
 7                What you're saying to the Court is that any
 8     time anyone is in the water and staying above water
 9     somehow, that they are participating in a sport, in your
10     opinion?
11          A.    Yes.
12          Q.    So a child that is learning how to swim and
13     is dog paddling across the pool and barely making it to
14     the edge to grab on, they're participating in a sport?
15          A.    Clearly, yes.
16          Q.    If Mount Vernon had wanted to, they could
17     have excluded from this policy participating in any lakes
18     or ponds, correct?
19                    MR. GROSS:  Form.
20          A.    Yes.
21     BY MR. STEWART:
22          Q.    And they chose not to, correct?
23          A.    Correct.
24          Q.    Now let's talk about physical activity.
25     Well, let me back up and ask you about athletic activity
```

```
 1     first.
 2               Do you consider any swimming also an
 3     athletic activity?
 4          A.    Yes, I do.
 5          Q.    How -- and do you consider any swimming a
 6     physical activity?
 7          A.    Yes, I do.
 8          Q.    Okay.  How do the terms "athletic activity"
 9     and "physical activity or sport" differ from each other,
10     if at all, in your opinion?
11               MR. GROSS:  Form.
12          A.    I prefer to give an example.
13               A physical activity could be walking down
14     the street, and a sport could be actually swimming.
15     BY MR. STEWART:
16          Q.    Okay.  We may disagree and the Court may
17     have to make this determination, but the policy was
18     written this way:
19               "Physical activity" comma -- I'm sorry.
20     "Athletic activity, physical activity" -- no comma -- "or
21     sport," correct?
22          A.    Yes.
23          Q.    So there's no separation between "physical
24     activity or sport," correct?
25          A.    Correct.
```

1          Q.    And it would have a different meaning if

2    there was a comma in there between "physical activity, or

3    sport," correct?

4                MR. GROSS:  Form.

5          A.    Yes, it would.

6    BY MR. STEWART:

7          Q.    All right.  So what is happening is "sport"

8    and "physical activity" are modifying each other, are to

9    be read in conjunction, correct?

10               MR. GROSS:  Form.

11         A.    Yes, but I believe both of those things

12   were occurring in this particular instance.

13               MR. STEWART:  I'll ask you to answer my

14           question, and I'll move to strike the

15           nonresponsive portion.

16   BY MR. STEWART:

17               My question is:  "Physical activity or

18   sport" in this context are modifying and -- modifying

19   each other and to be used in conjunction, correct?

20               MR. GROSS:  Form.

21         A.    Yes.

22   BY MR. STEWART:

23         Q.    Okay.  Now, you said a minute ago that -- I

24   think you said, and correct me if I'm wrong, I may have

25   gotten it a little wrong -- but I think you said that

1    walking could be a physical activity, but swimming could

2    be a sport, correct?

3         A.    Yes.

4         Q.    Okay.  And is that not the example that you

5    gave us?

6         A.    I did.

7         Q.    I just wanted to make sure I got it right.

8    I didn't write it down.

9              And so, what you're telling me is that

10    there are instances where walking --

11              You do recognize that walking is an Olympic

12    sport, correct?

13              MR. GROSS:  Form.

14         A.    Yes, it is.

15    BY MR. STEWART:

16         Q.    And you recognize that there are instances

17    where people are walking where they're not participating

18    in a sport, correct?

19         A.    Yes.

20         Q.    Give me an example of somebody walking

21    where they're not participating in a physical activity or

22    sport.

23              MR. GROSS:  Form.

24         A.    Somebody walking to their car from the

25    front door.

```
 1    BY MR. STEWART:

 2          Q.    Okay.  And why is it that that would be

 3    distinguished from some sporting-use of the word "walk"?

 4          A.    Because often people think of a

 5    sporting-walk as somebody trying to maybe lose weight or

 6    build up their heart rate and so forth.

 7          Q.    So, if an individual was not interested in

 8    competing with anybody, was not participating in any

 9    organized activity but just went out for a walk for

10    exercise, you consider that to be a physical activity or

11    sport?

12          A.    Absolutely.

13          Q.    Why?

14          A.    Well, it is a physical activity because

15    they're -- they're -- they're -- they're walking along;

16    that's a physical activity.

17          Q.    Okay.

18          A.    And -- and we don't know whether that

19    person was trying to lose one pound or something like

20    that by the walk that they're taking.

21          Q.    So now you're separating out the term

22    "physical activity" away from "sport," correct?

23               MR. GROSS:  Form.

24          A.    Yes.

25
```

```
 1   BY MR. STEWART:
 2        Q.   All right.  So if I hear you correctly, any
 3   time someone's doing something they're involved in
 4   physical activity, correct?
 5                MR. GROSS:  Form.
 6        A.   If you're sleeping and breathing, I don't
 7   believe you're involved in a physical activity.
 8   BY MR. STEWART:
 9        Q.   Good point.  Okay.  Beyond that, under this
10   policy, everything else would be a physical activity,
11   correct?
12        A.   I know that what O'Quan Reed was doing was
13   a physical activity.
14        Q.   Not my question.
15                Would you read back my question.
16                (Whereupon the above-requested portion of
17   the transcript was read back as above recorded.)
18        A.   Yes.
19   BY MR. STEWART:
20        Q.   Okay.  If Mount Vernon wanted to exclude
21   hunting or use of firearms from this -- from coverage in
22   this policy, they could have written that in this policy,
23   correct?
24                MR. GROSS:  Form.
25        A.   That's correct.
```

```
 1    BY MR. STEWART:

 2         Q.    And they chose not to do that, correct?

 3         A.    That's correct.

 4         Q.    Now, you would agree that a policy must be

 5    clear about what it covers and what it does not cover,

 6    correct?

 7         A.    Yes.

 8         Q.    And if it cannot be determined whether

 9    something is covered until after an incident occurs, then

10    that's not a clear policy, correct?

11               MR. GROSS:  Form.

12         A.    It's subject to the Court's interpretation.

13    BY MR. STEWART:

14         Q.    Okay.  Let me ask you this -- let me ask it

15    this way, because it may have been a little bit

16    confusing.

17               If there's a policy and it can't -- someone

18    can't determine whether or not an incident is covered

19    until after the incident occurs and they know all the --

20    you know, know exactly what happened, you can't determine

21    ahead of time what good is a policy for an insured if

22    they can't tell what's covered and what's not?

23               MR. GROSS:  Form.

24         A.    As an insurance agent for 23 years -- 22

25    plus years, I can tell you that there are multiple
```

1    instances where we don't know what is going to be covered

2    until after a claim occurs.  And so, I wouldn't call it

3    an unclear -- pardon the lack of proper English -- an

4    unclear policy.

5    BY MR. STEWART:

6         Q.    Do you think it is appropriate for you to

7    sell an insurance policy when an insured reads it and has

8    to decide whether they're going to do a certain activity,

9    and they can't tell whether it's cover covered or not

10   from reading the policy?  Do you think that's

11   appropriate?

12              MR. GROSS:  Form.

13        A.    No.

14   BY MR. STEWART:

15        Q.    All right.  So you would agree with me that

16   when an insured reads their policy, they need what is

17   covered and what's not covered, correct?

18        A.    Yes.

19        Q.    All right.  So if an insured reads the

20   policy and can't figure out whether or not a particular

21   activity is covered or not; that policy is unclear,

22   correct?

23              MR. GROSS:  Form.

24        A.    To the insured, but not necessarily to the

25   Courts.

```
 1    BY MR. STEWART:

 2         Q.    I'm not asking about the Court.  It's the

 3    insured that reads the policy to figure it out, because

 4    it's between the insured and the insurer, correct?

 5         A.    Yes.

 6         Q.    All right.  So the policy needs to be

 7    written in such a -- well, you know that policies should

 8    be written in plain English, correct?

 9         A.    Yes.

10         Q.    And they should be written so insureds can

11    understand them, not just Courts, correct?

12              MR. GROSS:  Form.

13         A.    Correct.

14    BY MR. STEWART:

15         Q.    So you would agree, would you not, that an

16    insurance policy that when the insured reads it and they

17    can't figure out whether or not a particular activity is

18    covered or not, that insurance policy is unclear,

19    correct?

20              MR. GROSS:  Form.

21         A.    It has the potential to be unclear to the

22    insured, correct.

23    BY MR. STEWART:

24         Q.    But that's who it's written for, correct?

25         A.    Yes.
```

```
 1                    MR. GROSS:  Form.
 2   BY MR. STEWART:
 3        Q.    You also know that policies -- policy
 4   exclusions must be liberally construed in favor of
 5   coverage and strictly against an insurer, correct?
 6                    MR. GROSS:  Form.
 7        A.    Yes, according to what I understand.
 8                    MR. STEWART:  What was wrong with the form?
 9                    MR. GROSS:  I think it calls for a legal
10        conclusion.
11   BY MR. STEWART:
12        Q.    So when the -- when one is interpreting
13   this policy, they're going to take the terms and
14   conditions under each one of these exclusions and
15   construe them in favor of coverage, correct?
16                    MR. GROSS:  Form.
17        A.    If there is lack of clarity, yes.
18   BY MR. STEWART:
19        Q.    Okay.  And if one were to take these
20   three -- when one takes these three exclusions, in
21   addition to construing them in favor of coverage, they're
22   also going to strictly construe them against Mount
23   Vernon, correct?
24                    MR. GROSS:  Form.
25        A.    I can't determine what the Court's going to
```

```
 1    do.
 2    BY MR. STEWART:
 3         Q.    Okay.  As an insurance agent, do you
 4    understand the law of Florida regarding insurance?
 5         A.    Yes.
 6         Q.    Do you understand that when you're looking
 7    at an exclusion and determining whether or not it
 8    applies, you not only liberally construe it in favor of
 9    coverage, but you also strictly construe it against the
10    insurer, correct?
11                MR. GROSS:  Form.
12         A.    Yes.
13    BY MR. STEWART:
14         Q.    So when we are -- when an insurance agent
15    such as yourself, as an expert, is looking at this case
16    in this claim and you're looking at these exclusions, you
17    are strictly construing them against Mount Vernon,
18    correct?
19         A.    I'm reading them as they're written.  I'm
20    not construing them against Mount Vernon.
21         Q.    You have to make a determination in this
22    case what the words in the policy means, because they
23    didn't prohibit swimming specifically, correct?
24                MR. GROSS:  Form.
25         A.    They prohibited sports or physical
```

1   activities.

2   BY MR. STEWART:

3        Q.    Sir, you have to construe what any of the

4   other words, including sports -- or "physical activity or

5   sports" or "athletic activity" means, because Mount

6   Vernon didn't define swimming as a prohibited activity,

7   correct?

8        A.    Correct.

9        Q.    And when you construe those terms, all of

10  the terms in the policy, you need to strictly construe

11  them against Mount Vernon, correct, the exclusions,

12  correct?

13       A.    No.

14       Q.    Why not?

15       A.    Because I believe that the -- the

16  exclusions were clearly written as to define what was --

17  as I said before, you're not going to list every single

18  sport or physical activity or athletic activity that

19  exists.  That's why.

20       Q.    Okay.  When a -- when a person is in a lake

21  and they're touching their feet on the ground and they're

22  walking along but they're chest deep in the water, is

23  that swimming under this policy -- no -- strike that.

24            Is that a physical activity or sport under

25  this policy?

```
 1          A.    Yes.
 2          Q.    Okay.  If someone is walking along in the
 3    lake with water up to their chest and they are just
 4    walking, is that a sport under this policy?
 5          A.    Yes.
 6          Q.    At what point does walking in a lake cease
 7    being a sport?
 8                MR. GROSS:   Form.
 9    BY MR. STEWART:
10          Q.    If ever?
11          A.    None that I can think of.
12          Q.    You would agree -- scratch that.
13                Isn't it true that O'Quan Reed died from
14    drowning?
15          A.    My understanding from reading the police
16    report is that's exactly what happened.
17          Q.    He didn't die from the zip line, correct?
18          A.    We don't know.
19          Q.    You have no evidence that he died from the
20    zip line, correct?
21          A.    Only that I just read a little while ago
22    that four people testified that he was -- had dropped
23    from the zip line, that were deposed.
24          Q.    Now we're talking something else that you
25    looked at that you didn't tell me about at beginning of
```

```
 1    the deposition.

 2           A.    I -- I did.  We -- we produced them.

 3           Q.    You produced those depositions?  Where are

 4    they?

 5           A.    No, the -- what were the documents?

 6           MR. GROSS:  He's referring to the summary

 7           judgment that you have.

 8           MR. STEWART:  Oh.

 9           MR. GROSS:  He told you just a few minutes

10           ago.  It's not part of his opinion, but for

11           clarity.

12    BY MR. STEWART:

13           Q.    Okay.

14           A.    I didn't read anybody's deposition.

15           Q.    I gotcha.  Fair enough.

16                 So what you read is the excerpts of

17    depositions that the lawyers representing Mount Vernon

18    selected in -- to incorporate in a document they filed

19    with the Court, correct?

20           A.    That's correct.

21           Q.    You don't know whether what they said later

22    on in the deposition contradicted that information,

23    correct?

24           A.    I have no knowledge of any of that.

25           Q.    And in formulating your opinions in this
```

 1     case, you had no evidence that O'Quan Reed died as a

 2     result of the zip line, correct?

 3            A.     No, but he died as a result of swimming.

 4            Q.     So just so it's clear on the record, I am

 5     correct in my statement that you have no evidence that he

 6     died as a result of zip-lining, correct?

 7            A.     Correct.

 8            Q.     Okay.  I just want to make -- you said "no"

 9     and I didn't -- sometimes that comes out weird.

10                   MR. GROSS:  Form.

11            A.     Sure.

12     BY MR. STEWART:

13            Q.     I hate myself when I get back to the office

14     and I read it and it looks terrible.

15                   Do you consider zip-lining a sport?

16            A.     Yes.

17            Q.     Why?

18            A.     Just because that's what I believe.

19            Q.     But you have no basis for it, other than

20     your own self-taught knowledge of zip-lining?

21            A.     That's correct.

22            Q.     All right.  What is your knowledge of

23     zip-lining?

24            A.     My knowledge of zip-lining is that a --

25     you're in a harness, and it traverses from one place to

```
 1    another to another to another sometimes, it depends on
 2    how many there, and it goes back to the original one
 3    sometimes and sometimes it doesn't.  And that's typically
 4    how zip-lining works.
 5            Q.    Okay.  And so do you have to be in a
 6    harness to be zip-lining?
 7            A.    You probably do not.
 8            Q.    Okay.  Have you ever zip lined?
 9            A.    No.
10            Q.    So your experience has been, what, reading
11    books about zip-lining?
12                  MR. GROSS:  Form.
13            A.    I've been on cruise ships where people have
14    told me that they've gone zip-lining.  That's my
15    knowledge of zip-lining.
16    BY MR. STEWART:
17            Q.    When they go on excursions off the boat?
18            A.    Yes.
19            Q.    How many occasions?
20            A.    I don't know.  I've been on 15 cruises, so
21    I've heard it many times.
22            Q.    Okay.  So, if I'm hearing you correctly,
23    your knowledge of zip lines is secondhand from others who
24    have done it?
25            A.    Yes, it is.
```

```
1          Q.     Any other knowledge of zip-lining?

2          A.     None at all.

3          Q.     Okay.  Are you aware of any zip-lining

4   associations that have competitions?

5          A.     No, I'm not.

6          Q.     Other than walking -- which you said

7   walking to your car, you gave earlier, can you name any

8   claims where someone would be injured that are not a

9   physical activity or sport?

10         A.     I said sleeping I don't consider to be a

11  physical activity.

12         Q.     You said that already, and I apologize, I

13  should have put that in my question and I didn't.

14                So other than sleeping or walking to your

15  car, can you name any other activities that you would

16  define as a physical activity or sport under the policy?

17         A.     No, I cannot.

18                MR. GROSS:  Form.

19  BY MR. STEWART:

20         Q.     Now let's talk about the water hazard for a

21  minute.

22                I assume that the reason that you

23  highlighted it and tagged it in your materials is because

24  you felt like this lake, or pond, or whatever you want to

25  call it, was a water hazard; fair statement?
```

```
 1          A.    Yes.

 2          Q.    Okay.  How would you define, under your

 3    terms, what a water hazard is?

 4          A.    Any body of water --

 5          Q.    Okay.

 6          A.    -- whatsoever, or even something as simple

 7    as a sink could be a water hazard to somebody.

 8          Q.    Okay.  Now, when someone is participating

 9    in an activity under this policy, how do you determine

10    when that person is no longer participating in that

11    activity?

12          A.    I would say when they go to rest or stop

13    whatever it is that they're doing.

14          Q.    Okay.  So for instance, if somebody was on

15    the merry-go-round on this property, and they got off the

16    merry-go-round and started walking to go over to the

17    slide; at what point in that transition, or before or

18    after it, have they stopped merry-go-rounding?  If that's

19    a word.

20                MR. GROSS:   Form.

21          A.    At the point which they got off the

22    merry-go-round.

23    BY MR. STEWART:

24          Q.    So if someone was zip-lining in this -- on

25    this pond, when would they stop zip-lining?
```

```
 1           A.    When they were no longer in contact with
 2    the zip line.
 3           Q.    Okay.  What do you mean by that?
 4           A.    Well, for example, Mr. Reed was apparently
 5    attempting to grab the handle of the zip line when he
 6    drowned.
 7           Q.    Okay.
 8           A.    Whether he dropped off the zip line or
 9    didn't drop off the zip line, I don't know.
10           Q.    Okay.
11           A.    But he was still involved in zip-lining at
12    that time.
13           Q.    Okay.  So, in your opinion, if O'Quan Reed
14    never used the zip line at all that day but swam out to
15    grab what you termed "the handle," you believe that, in
16    your definition under this policy, that that would be
17    using the zip line?
18           A.    Yes.
19           Q.    Okay.  And --
20           A.    Can we ask them to put the air on back.
21    I'm sorry.
22                 MR. STEWART:  I agree.
23                 (Brief recess.)
24    BY MR. STEWART:
25           Q.    Okay.  If O'Quan Reed swam out with the
```

1    intent to grab the handle, as you called it, and drowned,

2    and his drowning wasn't as a result of holding on to the

3    handle, in your opinion, is that a result of the zip

4    line?

5            A.    Yes.

6            Q.    If O'Quan Reed was just simply swimming in

7    the lake past the handle, quote, unquote, of the zip

8    line, is that zip -- use of the zip line, in your

9    opinion?

10           A.    No.

11           Q.    So what I hear you saying is that if O'Quan

12   Reed was intending upon grabbing the handle, as you've

13   called it, of the zip line, whether he reached it or not,

14   you believe that's use of the zip line, correct?

15           A.    Yes.

16                 MR. GROSS:  Form.

17   BY MR. STEWART:

18           Q.    Let's talk about rebounding devices.

19                 Your opinion is that this -- this zip line

20   was a rebounding device, correct?

21           A.    Yes.

22           Q.    And you base that upon what?

23           A.    Again, secondhand knowledge of how they

24   work; that they move from one place to another, and then

25   go back to the other place.

63

1         **Q.    So any item that moves from one place to**

2  **the other and goes back is a rebounding device under this**

3  **policy, in your opinion?**

4         A.    Within a certain category, yes.

5         **Q.    You're going to have to flesh that out for**

6  **me.**

7         A.    Well, if you do bungee jumping, that's

8  considered a rebounding device.  If you jump out of

9  airplanes with a bungee cord, I would think that's a

10  rebounding device.

11           And in this case, if he were to -- what we

12  term "zip" from one to -- one place to another, like a

13  perch to another, in -- in a -- with a device, that's

14  considered a rebounding device.

15         **Q.    Why?**

16         A.    I can't specify exactly why something is

17  called a rebounding device.

18         **Q.    I'm trying to figure out the characteristic**

19  **of a -- a --**

20           **Rebounding, to me, indicates that it**

21  **bounces back.  It's in the word.  It's the Latin root --**

22  **the Latin root of bound is to come back.**

23           **How is zip-lining in any way, shape, or**

24  **form -- this zip line -- coming back?**

25         A.    I don't know --

```
 1              MR. GROSS:  Form.

 2         A.    -- in this case what happened, but very

 3    often they go back to the place that they started from.

 4    BY MR. STEWART:

 5         Q.    Okay.  It's been described in this case

 6    that the way the zip line operates is someone goes down

 7    it, and after they go down it they physically return it,

 8    fast or slow, to the platform for the next person to use.

 9              Is that what you're terming "the rebound";

10    this person taking it back to the platform?

11         A.    That's a form of rebounding.

12         Q.    Okay.  And where do you get that definition

13    from?

14         A.    It's how I understand it to be.  That's

15    only from my -- my -- my general knowledge.

16         Q.    Okay.  And that begs the question of where

17    you arrived at that general knowledge.

18              Have you ever read a book that had that

19    contained within it?

20         A.    No.

21         Q.    Any articles that have that contained

22    within it?

23         A.    No.

24         Q.    Have you ever read that anywhere that says

25    that that type of apparatus, where someone physically
```

1   returns a zip line to the platform, that that causes it

2   to be a rebounding device?

3         A.    No.

4               MR. GROSS:  Form.

5   BY MR. STEWART:

6         Q.    Have you ever heard of the Alliance of

7   Schools for Cooperative Insurance Programs?

8         A.    I have not.

9         Q.    The ASCIP; never heard of them?

10        A.    I've never heard of them.

11        Q.    Okay.  They issued a risk alert regarding

12   rebounding devices, because some of their folks had some

13   questions about what is a "similar," quote, unquote,

14   "similar rebounding device."  And what they indicated is

15   what -- that it excluded from coverage were activities

16   where an individual bounces, rebounds, or oscillates more

17   than with once as an intended consequence of use.

18               Do you agree with that definition?

19               MR. GROSS:  Form.

20        A.    Yes.

21   BY MR. STEWART:

22        Q.    They also indicated in there, what they

23   call a Memorandum of Coverage, an MOC, that "similar

24   rebounding devices did not include gymnastic vaulting

25   springboards, the use of similar springboards for theater

```
 1   or film arts, special effects, Velcro Wall/Human Fly

 2   carnival events which utilize a springboard or an

 3   inflated launching pad to propel a participant into a

 4   padded wall, Bungee Run events wherein a harnessed

 5   participant is retracted back along an inflated pathway a

 6   single time by an anchored bungee cord, the use of

 7   swimming pool diving boards as part of a supervised

 8   physical education program.

 9               Do you agree that those would be covered

10   and are not similar rebounding devices?

11               MR. GROSS:  Form.

12         A.    Yes.

13   BY MR. STEWART:

14         Q.    Would a child's swing on a playground be

15   considered a rebounding device?

16         A.    Yes.

17         Q.    Because it goes back and forth?

18         A.    Yes.

19         Q.    Would -- I don't even know what it's

20   called, but on playgrounds they have these horses or

21   whatever kind of animal they build, and they are on these

22   really hard, thick springs right in the center, and they

23   sort of go back and forth and they make

24   wah-wah-wah-wah-wah.  Let's see -- I'd like to see you

25   type that.
```

```
 1                  Is that a similar rebounding device?
 2                  MR. GROSS:  Form.
 3           A.    Yes.
 4   BY MR. STEWART:
 5           Q.    Isn't it true that exclusionatory --
 6   exclusionary language is to be construed strictly and in
 7   favor of granting coverage to the insured?
 8                  MR. GROSS:  Form.
 9           A.    Yes.
10                  Excuse me.  Why don't I respond back to
11   that.
12                  If language is ambiguous, it is to be
13   construed as to be in favor of the insured.  If it is
14   clear, it is not necessarily to be in favor of the
15   insured.
16   BY MR. STEWART:
17           Q.    Am I correct that a binder, the preliminary
18   document used in the insurance industry to temporarily
19   bind coverage pending the issuance of a policy, is of no
20   effect or importance once the policy is issued?
21                  MR. GROSS:  Form.
22           A.    Correct.
23   BY MR. STEWART:
24           Q.    Now, you've indicated in your report -- and
25   you can certainly read along with me, if you'd like.  I'm
```

1  going to be asking you certain questions out of it.  I'm

2  on the bottom Page 2.

3           And you indicated that based upon the

4  endorsement/exclusion, nine -- I'm sorry L536, that the

5  claims are absolutely excluded from the policy -- and

6  then you go on with your sentence.

7           And really what I'm curious about is why

8  you used the term "absolutely."

9      A.    Because I think the endorsement is crystal

10 clear as to the exclusion for physical activity, athletic

11 activity and sports.

12     Q.    Okay.  All right.  And it says "or sports,"

13 correct?

14     A.    Or sports.

15     Q.    You see a difference there, don't you?

16     A.    Yes.

17     Q.    All right.  You've also used that term

18 "crystal clear."

19           What I'm curious about is why you felt the

20 need to have in your report that it's "absolutely

21 excluded" as opposed to just being "excluded."  What's

22 the difference?

23     A.    Because I found the exclusion endorsements

24 to be very well written.  And I, as an insurance agent

25 for many years, I've -- I understood them clearly and

1    believed that -- that -- that's why I use such strong

2    language, as opposed to just saying that they were

3    excluded.

4            **Q.    Okay.**

5            A.    I wanted -- excuse me.  I wanted there to

6    be left no doubt in anybody's mind that I felt that these

7    were completely clear, these exclusions.

8            **Q.    All right.  So if a policy is written where**

9    **it's unclear, you would not use the term "absolutely**

10   **excluded," you would just use the term "excluded"?**

11               MR. GROSS:  Form.

12           A.    Correct.

13   BY MR. STEWART:

14           **Q.    All right.  Your report also says that it**

15   **is customary for GL policies.  What is a GL policy?**

16           A.    General liability.

17           **Q.    What does that mean?**

18           A.    Well, it's a policy for things like

19   somebody falling down in this -- in this office building,

20   for example.  You know, just different things happening.

21           **Q.    It's termed --**

22           A.    You, unfortunately, falling from your chair

23   or something like that.

24               General -- that's what a general liability

25   policy does.  We call it slips, trips, and falls.  That's

1    what we call it in the insurance industry.

2          Q.    All right.  The reason it's called a

3    general liability policy is it generally covers the

4    injuries that can occur either at a certain place or to a

5    certain insured, correct?

6                MR. GROSS:  Form.

7          A.    Subject to the exclusions and the

8    endorsements in the policy, that's correct.

9    BY MR. STEWART:

10         Q.    We're going to get to the exclusions.

11               But if there were no exclusions, or

12   exceptions, or anything, it generally covers the damage

13   that's done, correct?

14         A.    Yes.

15         Q.    And that's why it's called a general

16   liability policy, right?

17         A.    Yes.

18         Q.    All right.  So you indicated that "it is

19   customary" -- I'm on Page 3 now -- "it is customary for

20   GL policies to be extremely tight as to what they will

21   cover."

22               Did you say that because they necessarily

23   include exclusions?

24         A.    Very often they're written as what are

25   termed "base policies," for lack of a better term, and

```
 1    then we would add endorsements that would either include

 2    or exclude things, depending upon the type of policy it

 3    was.

 4         Q.     All right.

 5         A.     For example, you might have a liquor

 6    liability endorsement on a particular policy, but that

 7    endorsement is going to cost X amount of dollars extra,

 8    in addition to the general liability policy.  So it could

 9    be a bar or a nightclub, or something like that, or a

10    restaurant, and you would include liquor liability in

11    there as well on a -- on a GL policy.

12         Q.     Okay.  What I'm not quite understanding is

13    why you stated that a GL policy are extremely tight as to

14    what they cover.

15              I thought we just discussed the fact that a

16    GL policy -- if you put aside the exclusions and

17    endorsements for a moment -- just a general GL policy

18    covers a lot of things, and is not real strict until you

19    get to the exclusions or the endorsements.

20         A.     It covers a lot of regular things that

21    might happen in the course of a general business, but it

22    typically does not cover the things that have a much

23    higher exposure to the insurance carrier; such as, I just

24    gave an example, liquor liability.  They're not just

25    going to throw in liquor liability coverage on a GL
```

1    policy just because.  It's going to cost you more than

2    the regular GL policy is going to cost you.

3         **Q.    I think we may be saying the same thing,**

4    **but -- and maybe I'm just misunderstanding your sentence**

5    **here, or the phrase, it's really not a full sentence --**

6    **but; am I correct that if you take out the exclusions --**

7    **or before you add the exclusions and the endorsements to**

8    **a GL policy, it's a rather general policy that covers a**

9    **lot of stuff?**

10        A.    Yes.

11        **Q.    Okay.  All right.  We're on the same page.**

12             **Now I'm on Page 4, Paragraph Number 2.  And**

13   **once again you say that it is absolutely clear that**

14   **Mr. Reed was operating a mechanical device on that day.**

15             **Is that correct?  Did I read that**

16   **correctly?**

17        A.    Well, from what I've read, yes, I did -- I

18   did -- I did state that, and I stated that because my

19   understanding was that he was reaching for the handle of

20   the zip line when he drowned.

21        **Q.    And so, you say -- your opinion, as we sit**

22   **here today -- and you can change it if you want, because**

23   **I think you said some other things before this about him**

24   **not using a zip line that day.  But your opinion, as you**

25   **sit here today, is that he was operating a mechanical**

73

1   **device on that day and you -- and you saw that in the**
2   **evidence in this case?**

3                   MR. GROSS:  Form.

4        A.    From what I've read, it appeared that he
5   was using that.  We are not necessarily 100 percent sure
6   that he was using a zip line that day.

7   BY MR. STEWART:

8        Q.    **In fact, there's nobody who says "I saw him**
9   **using the zip line," correct?**

10                  MR. GROSS:  Form.

11       A.    I hate to go back to it, but what I read a
12  half-hour before; we had the deposition that said
13  something in there that four -- four witnesses said that
14  they saw him using the zip line.

15  BY MR. STEWART:

16       Q.    **Why don't you find it since you've read**
17  **them.  It's probably in the statement of facts.  But I**
18  **don't want to -- I don't want to prevent you from finding**
19  **it.**

20                  THE WITNESS:  Do you know where it is?

21                  MR. GROSS:  I -- I --

22                  THE WITNESS:  You prefer not to find it?

23                  (Brief recess.)

24  BY MR. STEWART:

25       Q.    **Is that the only place?**

1           A.    I apologize.  I have made a mistake.  We

2     were talking about four of Bow Down's volunteers were

3     present the day that they suggested that he was swimming

4     at the time of his death, not zip-lining at the time of

5     his death.

6           Q.    Okay.

7           A.    That's what -- that's what I thought that I

8     read.  But I -- I did read this pretty quickly when -- in

9     a short period of time.

10          Q.    Fair enough.

11                So when you were testifying earlier today

12    in this deposition and you said that there -- you're

13    aware of four witnesses indicating that O'Quan Reed was

14    zip-lining, what you really meant was that he was

15    swimming?

16          A.    That I read that he was -- that they stated

17    that he was swimming.

18          Q.    Okay.

19          A.    Or that four people stated that he was

20    swimming.

21          Q.    You're not aware of any evidence in this

22    case that O'Quan Reed was zip-lining at the time that he

23    drowned, correct?

24          A.    Correct.

25          Q.    Oh, we were going through your report.  All

1    right.  In that same Number 2 paragraph on Page 4 you

2    indicated in the last sentence:  "The policy and this

3    endorsement are crystal clear" and you used the term

4    "crystal clear," as opposed to just "clear."  Why?

5         A.    I'm sorry, we're on Page --

6         Q.    4.

7         A.    4.

8         MR. GROSS:  Right here.

9         THE WITNESS:  I'm looking for where it

10    says --

11         MR. GROSS:  The last sentence it starts

12    with "the policy."

13         THE WITNESS:  Oh, okay.  The second to the

14    last sentence.

15         MR. GROSS:  Oh, I'm sorry.  That's right.

16         A.    Again, if he was not using -- if he was

17    not -- if -- if, in fact, it is shown that he was not

18    using a mechanical ride, then, obviously, this does not

19    apply.

20    BY MR. STEWART:

21         Q.    But I'm just curious as to -- is the answer

22    the same as to why you felt the need to use the term

23    "crystal clear," as opposed to just "clear"?

24         A.    Yes, because my understanding was that I

25    believed I had read in the documents that I was given

1   that he had -- was reaching for a handle for the zip

2   line.  So I felt that he was using a mechanical device at

3   that particular time.  So I felt that if he was doing

4   that then yes, in fact, he was -- he was -- he

5   was involved in the -- in the activity of zip-lining.

6          Q.     Okay.

7          A.     And that's why I used "crystal clear."

8          Q.     Why not just "clear"?

9          A.     Because I think the endorsement is very

10  explicit in its statement in terms of an exclusion for

11  any type of coverage for mechanical devices.

12         Q.     Does the Mount Vernon policy cover

13  drowning?

14         A.     I believe that there's not an exclusion for

15  drowning in the policy.

16         Q.     If someone drowned, would this policy cover

17  that?

18         A.     Assuming it wasn't preempted by any of the

19  excluding endorsements, yes.

20         Q.     Can you envision a scenario where somebody

21  drowns, yet they were not in an athletic activity,

22  physical activity or sport?

23         A.     It's kind of morbid, but yes.  I guess if

24  somebody was taking a bath and they fell asleep in the

25  bathtub and they slipped down and -- and -- and fell,

```
 1    they could ultimately drown from that.

 2          Q.    Okay.

 3          A.    I think it's happened to children,

 4    unfortunately.

 5          Q.    Okay.  So there is coverage for drowning,

 6    so long as one of the other exclusions does not apply?

 7                MR. GROSS:  Form.

 8          A.    I believe there's no exclusion for

 9    drowning.

10    BY MR. STEWART:

11          Q.    And how is that different from what I just

12    said?

13          A.    It doesn't list drowning in the policy, but

14    it lists physical injury and all types of other things

15    related to it.  So I believe that it's covered under that

16    component of the policy; that it didn't need to

17    specifically list the word "drowning" in the policy for

18    drowning to be covered in the policy.

19          Q.    Okay.  Let's move on to Item Number 4, at

20    the bottom of Page 4.  This is discussing the water

21    hazard.  Do you see where I'm at?

22          A.    Yes.

23          Q.    All right.  If, in fact, -- well, since you

24    are unable to find any application that is signed by Bow

25    Down, do you agree that it would not be fair to rescind a
```

```
 1    policy for a material misrepresentation, unless you

 2    actually have a signed policy where that occurred?

 3           A.    Yes.

 4                 MR. GROSS:  Form.

 5    BY MR. STEWART:

 6           Q.    You withdraw that opinion?

 7           A.    Yes.

 8           Q.    All right.  Moving on to Number 5.  I

 9    assume the first part of that opinion has to do with the

10    exclusions.  But would you agree that that last sentence

11    you also withdraw?

12                 MR. GROSS:  Form.

13           A.    Yes.

14    BY MR. STEWART:

15           Q.    And the other portions of that opinion have

16    to do with the exclusions?  Just so I'm clear.  I don't

17    want to assume something.

18           A.    That's correct.

19           Q.    Okay.  I thought so, but it's wrong for me

20    to assume things.

21                 And finally in Opinion 6, if I'm reading

22    this correctly, what you're saying is that the term

23    "athletics" in the medical payment section means the same

24    as physical -- "athletic activity, physical activity or

25    sport," correct?
```

1          A.     That's correct.

2                 I would like to go back to Number 4 for a

3     moment, if we can.

4          Q.     Sure.

5          A.     I wouldn't want to withdraw the entire

6     opinion that I have listed here.

7          Q.     Okay.

8          A.     But what I -- what I would suggest is that

9     an unsigned application is not an application that --

10    that will hold water.  Pardon the expression.  So I think

11    there's -- there's a problem with not seeing the signed

12    application that was there.

13                But my opinions listed there were preempted

14    upon the fact that there were discussions that occurred

15    for the actual application itself.  And if nobody can

16    produce a signed application, I think that -- that --

17    that I cannot stand behind that, that particular opinion.

18    **Q.     And it wouldn't be just producing a signed**

19    **application.  It would be producing a signed application**

20    **where Bow Down indicates that they do not participate in**

21    **water hazards, correct?**

22         A.     Yes, because that was one of the questions

23    that was asked on an application in terms of water

24    hazards, and they wanted to know whether water hazards

25    were included or excluded.

```
 1              Q.     Right.   And so, if we don't have an

 2   application signed by Bow Down where they are stating

 3   that they don't participate in water hazards, then you

 4   would agree to withdraw this opinion, correct?

 5              MR. GROSS:  Form.

 6         A.     Yes.

 7   BY MR. STEWART:

 8              Q.     Okay.   If Mount Vernon intended for the

 9   term "athletic" in the medical payment section to mean

10   the same as "athletic activity, physical activity or

11   sport," why didn't they just use the same term?

12              MR. GROSS:  Form.

13         A.     I think -- I can't speak for Mount Vernon,

14   but I believe that they wanted to be explicit in the

15   actual exclusion or endorsement that was there that went

16   on in greater detail than was there from the -- for the

17   main form of the policy.

18   BY MR. STEWART:

19              Q.     Isn't it true that in constructing an

20   insurance policy, when you mean the same thing you should

21   use the same term?

22              MR. GROSS:  Form.

23         A.     Yes.

24   BY MR. STEWART:

25              Q.     I'd like to go over the prior testimony.
```

 1    If you'll turn to whatever page that is, 7, of your

 2    report.

 3          A.    Sure.

 4          Q.    What I'm curious about is -- and you can do

 5    this as -- as -- what's the word I want? -- compact,

 6    short, as quickly as you'd like, but I'm just interested

 7    in what the claim was in each one of these cases,

 8    basically.

 9          A.    They go back some time, so, obviously, six

10    years is a hard thing to remember, all six years.

11          Q.    If you can't remember, you can't remember.

12          A.    The first one is a wholesale broker versus

13    a retail broker; what one was supposed to do versus

14    another.

15          Q.    So agent liability?

16          A.    Agent liability.  They missed a limit on

17    $100,000.  Obviously, that's a lot of money, but they

18    missed the limit on $100,000 in an aggregate limit --

19          Q.    Okay.

20          A.    -- and were sued over that.

21          Q.    And you represented -- or you testified on

22    behalf of --

23          A.    I represented Repath McCauley Woods, the

24    wholesale broker.  It's listed there.

25          Q.    Second one?

1         A.    That had to do with a workers' compensation

2  case.

3         **Q.**    **Okay.**

4         A.    So it had nothing to do with anything even

5  remotely related to what we're talking about.

6         **Q.**    **Okay.**

7         A.    Third one I believe had to do with a

8  municipal power agency not putting in the appropriate

9  power units for a particular jurisdiction, and getting

10  sued for that, because they hadn't put in enough of the

11  units for a particular area.

12         **Q.**    **And how did that involve insurance?  Or did**

13  **it?**

14         A.    I think -- I think I -- I -- somehow it

15  involved -- there was a liability exposure there, in

16  terms of what they were supposed to do.  I don't

17  remember.  It goes back probably almost six years.

18         **Q.**    **Okay.  And who did you testify on behalf**

19  **of?**

20         A.    I represented --

21         **Q.**    **Oh, you've got it there.  Go ahead.  You**

22  **can move on.**

23         A.    Number 4:  I apologize, I don't remember.

24         **Q.**    **Okay.**

25         A.    Number 5:  Shore Delray Beach was a

1   restaurant, and it had to do with liability related to

2   windstorm exposure in a restaurant.

3          **Q.    And you testified on behalf of the**

4   **insurance company?**

5          A.    I did.

6          **Q.    Okay.**

7          A.    For 6:  I've asked and answered it.  I

8   cannot remember 6.

9          **Q.    Okay.**

10         A.    Number 7 I do remember.  It's a little

11  boring.  But there was an Italian restaurant at the end

12  of a pier in Pensacola Beach, and somebody did not sell

13  them flood insurance.  When -- and there was --

14  obviously, it was a year where there were massive

15  hurricanes coming in and they were damaged terribly.

16         **Q.    And you testified on behalf of --**

17         A.    And I testified on behalf of Lillo's

18  Italian Restaurant in Pensacola.

19         **Q.    Okay.**

20         A.    Number 8:  I don't remember.

21         **Q.    All right.**

22         A.    Number 9:  Just wrapped up, believe it or

23  not, it was 15 years.  I was hired by Wilkie Farr &

24  Gallagher in New York.

25         **Q.    And which side did you represent?**

```
 1          A.     Tiara -- I -- I -- Marsh & McClennan, the

 2   broker.

 3          Q.     Okay.

 4          A.     Or Marsh, the broker.

 5                 It had to do with $120,000,000 in windstorm

 6   damage, and they were fighting with everybody over who

 7   was going to pay for it.

 8          Q.     All right.

 9          A.     It ultimately wrapped up.

10                 The next one:  I was hired.  It had to do

11   with a directors and officers insurance case.

12          Q.     Let's move on.

13          A.     Okay.  Number 11 was an auto accident case.

14          Q.     And you testified both for Number 10 and

15   Number 11 on behalf of the insurance company?

16          A.     Yes.

17          Q.     Okay.  12?

18          A.     12 was another windstorm insurance case

19   where there was tremendous windstorm damage, and the

20   insurance company wasn't able to pay, or didn't want to

21   want to pay as much it was supposed to pay.  So that's

22   the case I was involved in.

23          Q.     And you testified on behalf of the

24   insurance company in that one?

25          A.     Yes.
```

1          Q.      All right.

2          A.      And the next one was actually one where I

3    mentioned the -- having to do with liquor liability.  It

4    was somebody who owns a bar in Fort Lauderdale with a

5    pool in the middle of a bar, which is kind of

6    unbelievable if you can kind of think about that, and --

7    which is a terrible accident waiting to happen.  And it's

8    been there a lot of years and there was a terrible

9    accident there, and I was involved.

10         Q.      And who did you testify on behalf of?

11         A.      I testified on behalf of the -- by the bar

12   and grill.

13         Q.      All right.

14         A.      Number 14 was an auto accident.

15         Q.      And you testified on behalf of the defense,

16   I mean the insurance company?

17         A.      Yes, USAA Casualty Insurance Company.

18   That's correct.

19                 Another was -- Number 15 was another liquor

20   liability case, unfortunately, as you can see, Beach Bars

21   USA.

22         Q.      And you testified on behalf -- or you were

23   retained on behalf of the bar or restaurant?

24         A.      Yes.

25         Q.      You've got a nice little bar restaurant

1    business going, huh?  You don't have to answer that.

2         A.    I didn't mean to, but people found me.

3         Q.    16?

4         A.    16 was a horror.  It was an individual

5    attorney who sued Allstate Insurance Company for not

6    getting the work she was supposed to get from Allstate

7    Insurance Company as an attorney for Allstate Insurance

8    Company.  And she fought them for many, many, many years.

9    And I don't know what the end result was of that.

10        Q.    You testified on behalf of her lawyer?

11        A.    Yes.  That was my deposition that lasted

12   eight hours.

13        Q.    This one won't last that long.

14        A.    Okay.

15             Number 17 is a -- unfortunately, it's

16   another -- and there's a lot of them down here, as you

17   understand, a lot of hurricane insurance claims.  This

18   was a hurricane insurance claim against the Ventnor "B",

19   which was one of the Kings -- not Kings, but one of the

20   Century Village condominiums.

21        Q.    And who did you testify on behalf of?

22        A.    On behalf of the -- the condominium.

23        Q.    Okay.  What's the next one?

24        A.    I don't remember.

25        Q.    Okay.

1          A.      You're right.  I guess I've been doing a

2     bunch of liquor liabilities.

3               Number 19 is another liquor liability case

4     with Bombay Liquors.

5          **Q.      And you testified on behalf of the liquor**

6     **license holder?**

7          A.      Yes.

8          **Q.      Okay.  Next one?**

9          A.      The next one is pretty interesting.  It's

10    a -- it's still going on.  It's a case where a -- how do

11    you describe them?  We call them MGAs, like a wholesaler,

12    different -- a little bit different than a wholesaler.

13              Basically, took advantage of a wholesaler,

14    who was insuring a couple billion dollars worth of

15    property in the United States.

16         **Q.      So it's basically an agent liability case?**

17         A.      It was an agent liability, but the guy is

18    in federal prison right now for what he did.  So it

19    didn't work out well for him.  It was -- it went on and

20    he lost a fortune, I mean, in terms of he had to go back

21    and replace his insurance.  So that's all.

22         **Q.      Okay.  21?**

23         A.      The person who didn't buy life insurance --

24    who bought life insurance and then ultimately said that

25    they wanted to cancel their life insurance.  And they

```
 1   were in the process of getting a divorce and he committed
 2   suicide and nobody got paid, because he let the policy
 3   lapse.  So...
 4         Q.    Did you notice, as you were going through
 5   the Mount Vernon policy, that they had two separate
 6   exclusions for trampolines and rebounding devices?
 7         A.    No.
 8         Q.    All right.  I'm going to ask you what's the
 9   quickest way for you to find -- I can show it to you.
10   Let me see if I've got it.  I mean, do you even know what
11   I'll talking about?  And maybe we're just saying the same
12   thing.
13         A.    Well, I know -- I know that -- I mean, I
14   know what -- I understand what the question means.
15         Q.    Right.  But do you know that there's an
16   exclusion for trampoline or rebounding devices --
17         A.    Right.
18         Q.    -- it's L-433?
19               I don't have any Bate stamps on this.  I'm
20   sorry, I thought I did.
21               And then you've got L-607, which is an
22   exclusion for climbing, rebounding, and interactive games
23   or devices, that has under letter C:  "Trampolines or
24   similar rebounding devices"?
25         A.    No, I was not aware of that.
```

1          Q.     You agree that those are the same thing?

2          A.     Yes.

3          Q.     Why is it that an insurance policy would be

4    written excluding the same thing twice?

5                 MR. GROSS:  Form.

6          A.     I can't speak for the insurance company.

7    BY MR. STEWART:

8          Q.     All right.  In your experience, when an

9    insurance policy excludes the same thing twice, that's

10   poor drafting, correct?

11                MR. GROSS:  Form.

12         A.     Yes.

13   BY MR. STEWART:

14         Q.     You would agree that this policy, based

15   upon that particular example, is poorly drafted, correct?

16                MR. GROSS:  Form.

17         A.     Not the policy, but those particular

18   endorsements.

19   BY MR. STEWART:

20         Q.     Okay.  With regard to that January 28, 2011

21   memo and the e-mail that we talked about -- it's in the

22   materials.  If you want to look at it, you're welcome to

23   refer to it.  -- if it is only communication between

24   Mount Vernon and Genesee, you -- do you agree that that

25   does not bind Bow Down?

```
 1                    MR. GROSS:   Form.

 2          A.    I agree with you.

 3   BY MR. STEWART:

 4          Q.    Now, you also indicated in your report --

 5   and I missed it as I was going through it -- under -- on

 6   Page 8 of 16 of the policy, under Supplemental Payments

 7   Coverage A and B, Number 1D indicates that "Mount Vernon

 8   will pay all reasonable expenses incurred by the insured

 9   at our request to assist us in the investigation or

10   defense of the claim or suit, including actual loss of

11   earnings up to $250 a day because of time off from work."

12                I'll show it to counsel first, and ask you

13   what that means.

14          A.    It's basically --

15          Q.    Let him -- let him read it first and then

16   you can read it.  And you're welcome --

17          A.    I'm familiar with it.

18          Q.    Okay.

19          A.    It's basically a duty to defend policy, and

20   states that they will defend them under those

21   circumstances; however, the endorsements state that --

22   and I believe I read this and I can't recall exactly

23   where it was -- that any time the endorsements are

24   basically stronger and exclude the actual main form of

25   the policy, then it does not become a duty to defend
```

1    policy any longer.

2          Q.    I think we're talking cross purposes.  Why

3    don't you read what -- and you're welcome to refer to the

4    page before -- read what I have highlighted and let me

5    know when you're done reading it.

6          A.    I understand this.

7          Q.    Okay.  Does that mean that Mount Vernon

8    should reimburse Bow Down for all reasonable expenses

9    they incur at Mount Vernon's request to assist in the

10   investigation and defense of the claim?

11         A.    I think --

12               MR. GROSS:  Form.

13         A.    -- only the Court can determine that, but

14   perhaps yes.

15   BY MR. STEWART:

16         Q.    Why can't you determine it?

17         A.    I'm not -- I'm not the Court.  As I said, I

18   believe that there was -- that this does not become a

19   duty to defend policy if the exclusions preempt the

20   actual policy itself, which they did -- and which I

21   believe they do in this case.

22         Q.    Oh, I see what you're saying.  In other

23   words, if one of the exclusions applies, you think that

24   it also excludes them from reimbursing Bow Down

25   reasonable expenses?

1          A.    I think I wrote that in my report.  This is

2   not a duty to defend policy any longer.

3          Q.    Oh, okay.  I see what you're saying.  But

4   you didn't talk about it specifically with regard to

5   reasonable expenses?

6          A.    No.  No, I did not.

7          Q.    Gotcha.

8                And if the exclusions that we've discussed

9   here today; the mechanical ride, the trampoline or

10  rebounding device, or the athletic activity, physical

11  activity or sports exclusion -- exclusions do not apply,

12  then it is your opinion that Mount Vernon has a duty to

13  defend?

14         A.    Yes.

15               MR. GROSS:  Form.

16  BY MR. STEWART:

17         Q.    And if the exclusions; mechanical ride,

18  trampoline or rebounding device, or physical activity --

19  or athletic activity, physical activity or sport do not

20  apply, and Bow Down is found liable for Mr. Reed's

21  unfortunate death, do you agree that they should cover

22  this claim -- Mount Vernon should cover this claim?

23               MR. GROSS:  Form.

24         A.    If the exclusions do not apply, yes.

25               MR. STEWART:  I think I'm done.  Let me

```
 1              just review.
 2   BY MR. STEWART:
 3         Q.    Getting back to the issue of the handle, as
 4   you have termed it, the zip line handle.
 5              Is it true that actually being on the zip
 6   line is using the zip line?
 7         A.    In my opinion, yes.
 8         Q.    Okay.  In your opinion, if something were
 9   to happen to somebody while they were actually on the zip
10   line, if they got injured, in your opinion, is that -- is
11   that -- would that injury be arising out of the use of a
12   zip line?
13         A.    Yes, it would.
14         Q.    Okay.  If somebody were -- as the issues
15   are in this case -- if somebody were swimming out to
16   the -- to the "handle," as you've termed it, would that
17   be an incidental use of the zip line?
18              MR. GROSS:  Form.
19         A.    Yes.
20   BY MR. STEWART:
21         Q.    And if somebody were swimming out -- just
22   swimming in the lake and went by the zip line, that
23   wouldn't even be incidental use, correct?
24              MR. GROSS:  Form.
25         A.    That would be correct.
```

1                    MR. STEWART:  All right.  That's all I

2          have.

3                    MR. GROSS:  Okay.  Then we'll read.

4                    THE COURT REPORTER:  Do you want me to type

5          this up?

6                    MR. STEWART:  Please.  I'd like a full PDF

7          and that is it.

8                    THE COURT REPORTER:  That's it?

9                    MR. STEWART:  That's all I use.

10                   THE COURT REPORTER:  And you'll let me

11         know?

12                   MR. GROSS:  We'll take a copy.  That's

13         fine.

14                   (Thereupon, the proceedings concluded at

15         3:21 p.m.)

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OATH

THE STATE OF FLORIDA )

COUNTY OF PALM BEACH )

             I, the undersigned authority, certify that

Scott Stein, A.R.M. personally appeared before me and was

duly sworn on the 7th day of July, 2015.


             Signed this 14th day of July, 2015.


                 _Robyn Maxwell_
                 _____

                 Robyn Maxwell, RPR, FPR, CLR

                 Realtime Systems Administrator

                 Notary Public - State of Florida

                 My Commission No. FF 091862

                 My Commission Expires: 4/4/2018

CERTIFICATE OF REPORTER

THE STATE OF FLORIDA )

COUNTY OF PALM BEACH )

   I, Robyn Maxwell, Florida Professional Reporter, certify that I was authorized to and did stenographically report the deposition of Scott Stein, A.R.M., pages 1 through 98; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

   I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

   DATED this 14th day of July, 2015.

Robyn Maxwell, RPR, FPR, CLR

Realtime Systems Administrator

14th of July, 2015

Scott Stein, A.R.M.
c/o Stephen R. Gross, Esquire
FOWLER, WHITE, BURNETT, P.A.
100 Southeast 3rd Avenue
12th Floor
Fort Lauderdale, FL 33394


IN RE:  Bow Down vs. Mt. Vernon Fire Insurance
CASE NO.:  9:15-CV-80072-DMM

Please take notice that on the 7th day of July, 2015, you
gave your deposition in the above cause.  At that time
you did not waive your signature.

The above-addressed attorney has ordered a copy of this
transcript and will make arrangements with you to read
their copy.  Please execute the Errata Sheet, which can
be found at the back of the transcript, and have it
returned to us for distribution to all parties.

If you do not read and sign the deposition within 30
days, the original, which has already been forwarded to
the ordering attorney, may be filed with the Clerk of the
Court.

If you wish to waive your signature now, please sign
your name in the blank at the bottom of this letter and
return it to the address listed below.

Very truly yours,

Robyn Maxwell, RPR, FPR, CLR
Phipps Reporting, Inc.
1615 Forum Place, Suite 500
West Palm Beach, Florida 33401



I do hereby waive my signature.


_____
Scott Stein, A.R.M.

ERRATA SHEET
DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
IN RE: Bow Down vs. Mt. Vernon Fire Insurance
CASE NO. 9:15-CV-80072-DMM
WITNESS:  SCOTT STEIN, A.R.M.            TAKEN:  07/07/2015


PAGE     LINE     CHANGE          REASON FOR CHANGE
_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____


          Under penalties of perjury, I declare that
I have read the foregoing document and that the facts
stated in it are true.


_____      _____
Date                  Scott Stein, A.R.M.

**A**

**A.R.M (14)**
1:13 3:3 4:11
8:13 9:11,14
9:18 10:6 95:9
96:9 97:2,25
98:3,25
**Aaron (2)**
3:11 25:15
**able (3)**
24:2 34:9 84:20
**above-address...**
97:9
**above-request...**
48:16
**absolute (1)**
25:22
**absolutely (6)**
47:12 68:5,8,20
69:9 72:13
**accident (4)**
84:13 85:7,9,14
**account (1)**
35:9
**action (2)**
96:15,16
**activities (14)**
25:4,8,8 38:12
39:13 41:15,16
41:21,22,24,25
54:1 59:15
65:15
**activity (68)**
11:20,20 25:5
25:23,24 28:3
28:3 29:9,9,13
29:14 38:15
39:10 43:3,5
43:24,25 44:3
44:6,8,9,13,19
44:20,20,24
45:2,8,17 46:1
46:21 47:9,10
47:14,16,22
48:4,7,10,13
50:8,21 51:17

54:4,5,6,18,18
54:24 59:9,11
59:16 60:9,11
68:10,11 76:5
76:21,22 78:24
78:24 80:10,10
92:10,11,18,19
92:19
**actual (10)**
13:13 21:14
32:16 40:3,5
79:15 80:15
90:10,24 91:20
**Adam (3)**
34:23,24 37:9
**add (3)**
18:8 71:1 72:7
**added (1)**
23:9
**addition (2)**
52:21 71:8
**additional (1)**
12:23
**address (3)**
4:20,24 97:16
**Administrator...**
1:25 95:22
96:25
**admission (1)**
42:17
**advantage (1)**
87:13
**affirm (1)**
4:5
**affirmative (2)**
16:20,23
**affirmed (1)**
4:12
**agency (2)**
5:1 82:8
**agent (8)**
49:24 53:3,14
68:24 81:15,16
87:16,17
**Agents (1)**
10:20
**aggregate (1)**

81:18
**ago (5)**
9:23 29:25
45:23 55:21
56:10
**agree (16)**
40:24 49:4
50:15 51:15
55:12 61:22
65:18 66:9
77:25 78:10
80:4 89:1,14
89:24 90:2
92:21
**agreement (2)**
3:13 19:24
**ahead (6)**
19:5,23 39:18
40:18 49:21
82:21
**air (2)**
31:4 61:20
**airplanes (1)**
63:9
**alert (2)**
10:25 65:11
**Alliance (1)**
65:6
**Allstate (3)**
86:5,6,7
**ambiguous (1)**
67:12
**America (5)**
8:14,17 10:7,11
10:16
**amount (1)**
71:7
**amusement (2)**
38:25 39:3
**anchored (1)**
66:6
**animal (1)**
66:21
**animals (1)**
36:18
**answer (8)**
6:23 16:19,23

31:15,16 45:13
75:21 86:1
**answered (2)**
30:13 83:7
**answers (1)**
35:1
**anybody (2)**
42:4 47:8
**anybody's (2)**
56:14 69:6
**anyway (2)**
25:11 29:6
**apologize (7)**
7:6 15:14 19:15
31:3 59:12
74:1 82:23
**apparatus (1)**
64:25
**apparently (1)**
61:4
**APPEARAN...**
2:1
**appeared (2)**
73:4 95:9
**applicable (3)**
26:20,23 29:18
**application (28)**
31:17,19 32:15
32:16,19,24
33:4,16,21,23
33:25 34:3,5,6
34:7 38:10
39:8,12 77:24
79:9,9,12,15
79:16,19,19,23
80:2
**applications (1)**
34:8
**applies (2)**
53:8 91:23
**apply (7)**
38:22 39:14
75:19 77:6
92:11,20,24
**appropriate (5)**
9:11,12 50:6,11
82:8

**approximatel...**
5:2,11 7:18 8:25
8:25
**area (2)**
11:2 82:11
**areas (1)**
9:9
**argument (2)**
27:11,13
**arguments (1)**
27:14
**arising (1)**
93:11
**arrangements...**
97:10
**arrived (1)**
64:17
**articles (1)**
64:21
**arts (1)**
66:1
**ASCIP (1)**
65:9
**aside (1)**
71:16
**asked (8)**
11:3 12:7 14:12
20:5 42:14,14
79:23 83:7
**asking (3)**
37:10 51:2 68:1
**asks (1)**
37:6
**asleep (1)**
76:24
**assist (2)**
90:9 91:9
**associate (1)**
8:13
**Association (1)**
10:20
**associations (1)**
59:4
**assume (4)**
59:22 78:9,17
78:20
**Assuming (1)**

76:18
**athletic (19)**
11:20 25:4,8,23
28:3 29:8
43:25 44:3,8
44:20 54:5,18
68:10 76:21
78:24 80:9,10
92:10,19
**athletics (3)**
11:19 26:5
78:23
**attach (1)**
18:1
**attached (2)**
3:13 15:9
**attempting (1)**
61:5
**attention (1)**
21:8
**attorney (10)**
15:1,2,5 17:4
86:5,7 96:13
96:15 97:9,13
**attorneys (7)**
14:12 15:19
17:2,15 23:10
31:11,14
**authoritative (...**
8:17
**authority (1)**
95:8
**authorized (1)**
96:7
**auto (3)**
5:21 84:13
85:14
**available (2)**
9:22 14:10
**Avenue (2)**
2:9 97:3
**awarded (2)**
9:18 10:6
**aware (4)**
59:3 74:13,21
88:25

―――――― **B** ――――――
**B (2)**
86:18 90:7
**back (30)**
13:18 15:16
18:3 22:7 27:8
40:18 43:25
48:15,17 57:13
58:2 61:20
62:25 63:2,21
63:22,24 64:3
64:10 66:5,17
66:23 67:10
73:11 79:2
81:9 82:17
87:20 93:3
97:11
**background (2)**
7:20 8:10
**Baker (2)**
5:25 6:6
**Baker's (1)**
38:3
**bar (6)**
71:9 85:4,5,11
85:23,25
**barely (1)**
43:13
**Bars (1)**
85:20
**base (2)**
62:22 70:25
**baseball (2)**
28:13 41:17
**based (3)**
33:16 68:3
89:14
**basically (8)**
12:15 15:2 81:8
87:13,16 90:14
90:19,24
**basis (1)**
57:19
**Bate (2)**
32:8 88:19
**bath (1)**

76:24
**bathtub (1)**
76:25
**BBA (1)**
8:2
**Beach (8)**
1:2,18 82:25
83:12 85:20
95:3 96:4
97:19
**began (2)**
4:2 27:5
**beginning (2)**
12:22 55:25
**begs (1)**
64:16
**behalf (18)**
2:3,8 81:22
82:18 83:3,16
83:17 84:15,23
85:10,11,15,22
85:23 86:10,21
86:22 87:5
**believe (22)**
10:9 19:6 21:16
24:23 28:13
29:12 34:4
45:11 48:7
54:15 57:18
61:15 62:14
76:14 77:8,15
80:14 82:7
83:22 90:22
91:18,21
**believed (6)**
21:13 24:20
25:20 35:20
69:1 75:25
**better (1)**
70:25
**Beyond (1)**
48:9
**Billing (1)**
3:10
**billion (1)**
87:14
**bind (3)**

35:8 67:19
89:25
**binder (6)**
30:5 35:2,7,12
37:4 67:17
**binding (1)**
35:10
**bit (3)**
12:13 49:15
87:12
**blank (1)**
97:15
**blue (3)**
22:7 23:7,10
**boards (1)**
66:7
**boat (1)**
58:17
**Boca (1)**
4:21
**body (1)**
60:4
**Bombay (1)**
87:4
**book (2)**
10:2 64:18
**books (1)**
58:11
**boring (1)**
83:11
**bottom (4)**
18:8 68:2 77:20
97:15
**bought (1)**
87:24
**Boulevard (1)**
1:18
**bounces (2)**
63:21 65:16
**bound (1)**
63:22
**Bow (24)**
1:4 3:12 5:24
6:2 31:16
32:17 33:4,14
34:8,17 36:8
38:4 40:3,5

74:2 77:24
79:20 80:2
89:25 91:8,24
92:20 97:6
98:2
**box (1)**
22:18
**Boynton (1)**
1:18
**breathing (1)**
48:6
**Brief (3)**
31:7 61:23
73:23
**bring (5)**
11:6 12:7,9
19:15,18
**broker (6)**
42:18 81:12,13
81:24 84:2,4
**brokerage (5)**
5:7,24 6:7 37:24
37:25
**brokerage-typ...**
5:14
**brokers (3)**
5:18 6:18,21
**brought (2)**
12:10,16
**build (2)**
47:6 66:21
**building (1)**
69:19
**bulletin (1)**
10:24
**bunch (1)**
87:2
**bungee (4)**
63:7,9 66:4,6
**BURNETT (2)**
2:8 97:3
**business (10)**
5:7,8,9,14 6:17
6:22,25 39:7
71:21 86:1
**buy (1)**
87:23

**C**

**C (2)**
26:4 88:23
**c/o (1)**
97:2
**calculations (1)**
14:22
**call (12)**
10:12,23,25
28:15 37:23
39:1 50:2
59:25 65:23
69:25 70:1
87:11
**called (15)**
10:24 21:10
23:17 24:16
29:4 30:14
32:3,14 40:12
62:1,13 63:17
66:20 70:2,15
**calls (1)**
52:9
**camping (2)**
30:23 36:11
**cancel (1)**
87:25
**cancellation (4)**
16:12 21:11,14
21:16
**car (3)**
46:24 59:7,15
**career (1)**
28:7
**carnival (1)**
66:2
**carrier (3)**
21:17 32:23
71:23
**carriers (2)**
5:17 6:21
**case (38)**
1:2 5:24 7:11
10:23 11:9,12
13:12 14:18
15:17 18:6

23:21 24:18
26:14,20,24
27:11 33:3
53:15,22 57:1
63:11 64:2,5
73:2 74:22
82:2 84:11,13
84:18,22 85:20
87:3,10,16
91:21 93:15
97:6 98:2
**cases (1)**
81:7
**casualty (3)**
7:4 8:22 85:17
**categories (2)**
6:5 38:21
**category (3)**
6:6,14 63:4
**cause (1)**
97:8
**causes (1)**
65:1
**cease (1)**
55:6
**center (1)**
66:22
**Century (1)**
86:20
**certain (7)**
9:9 14:13 50:8
63:4 68:1 70:4
70:5
**certainly (1)**
67:25
**CERTIFICA...**
3:5,5 95:1 96:1
**certification (1)**
9:5
**Certified (1)**
8:22
**certify (3)**
95:8 96:7,12
**chair (1)**
69:22
**change (3)**
72:22 98:4,4

**changed (1)**
7:5
**CHANGES (1)**
98:1
**characteristic ...**
63:18
**charge (1)**
18:13
**charts (1)**
15:12
**check (1)**
23:3
**checked (1)**
13:21
**chest (2)**
54:22 55:3
**child (1)**
43:12
**child's (1)**
66:14
**children (2)**
77:3
**choose (2)**
6:14,16
**chose (3)**
41:7 43:22 49:2
**circle (2)**
38:21 39:13
**circled (1)**
31:18
**circumstances...**
90:21
**claim (10)**
16:14 31:24
50:2 53:16
81:7 86:18
90:10 91:10
92:22,22
**claimed (1)**
24:18
**claims (4)**
28:22 59:8 68:5
86:17
**clarity (3)**
23:6 52:17
56:11
**clear (17)**

27:3 49:5,10
57:4 67:14
68:10,18 69:7
72:13 75:3,4,4
75:23,23 76:7
76:8 78:16
**clearer (1)**
39:13
**clearly (3)**
43:15 54:16
68:25
**Clerk (1)**
97:13
**climbing (2)**
30:1 88:22
**clip (2)**
30:5 32:14
**CLR (4)**
1:24 95:21
96:24 97:18
**come (4)**
18:10 28:1
42:19 63:22
**comes (1)**
57:9
**coming (2)**
63:24 83:15
**comma (5)**
25:9,10 44:19
44:20 45:2
**Commission (2)**
95:24,25
**committed (1)**
88:1
**common (1)**
11:21
**communicatio...**
30:11 89:23
**compact (1)**
81:5
**company (14)**
1:8,8 3:12 6:1
83:4 84:15,20
84:24 85:16,17
86:5,7,8 89:6
**compensation ...**
82:1

**competing (3)**
42:1,4 47:8
**competition (2)**
42:5,9
**competitions (1)**
59:4
**competitive (1)**
41:23
**complaint (4)**
16:2,4,21,24
**complete (1)**
96:11
**completely (1)**
69:7
**component (1)**
77:16
**components (1)**
9:10
**concluded (1)**
94:14
**conclusion (1)**
52:10
**conclusions (1)**
25:1
**conditions (1)**
52:14
**condominium ...**
86:22
**condominium...**
86:20
**confusing (1)**
49:16
**conjunction (2)**
45:9,19
**connected (1)**
96:15
**consequence (1)**
65:17
**consider (9)**
12:18,18 39:25
42:21 44:2,5
47:10 57:15
59:10
**considered (4)**
42:13 63:8,14
66:15
**constructing (1)**

80:19
**construe (7)**
52:15,22 53:8,9
54:3,9,10
**construed (3)**
52:4 67:6,13
**construing (3)**
52:21 53:17,20
**consulting (2)**
3:13 19:23
**contact (1)**
61:1
**contained (2)**
64:19,21
**context (1)**
45:18
**Continue (2)**
16:4,8
**continuing (1)**
18:18
**contracts (1)**
5:16
**contradicted (1)**
56:22
**conversation (1)**
37:22
**Cooperative (1)**
65:7
**copies (4)**
12:14,19 14:9
14:11
**copy (8)**
15:16,21 17:22
17:23 18:3
94:12 97:9,10
**cord (2)**
63:9 66:6
**corporation (1)**
1:5
**correct (121)**
7:12,18 10:18
11:10,22 13:17
20:5,18,19
21:2 22:14
23:19,20 24:9
24:12 25:18
27:11 29:3

30:3,25 31:12
33:5,12 34:18
34:20 35:13,23
36:25 37:10,12
37:17,19 38:1
38:2,4 40:14
40:17 41:2,5,7
41:9,11 42:1,6
42:9,12 43:18
43:22,23 44:21
44:24,25 45:3
45:9,19,24
46:2,12,18
47:22 48:4,11
48:23,25 49:2
49:3,6,10
50:17,22 51:4
51:8,11,13,19
51:22,24 52:5
52:15,23 53:10
53:18,23 54:7
54:8,11,12
55:17,20 56:19
56:20,23 57:2
57:5,6,7,21
62:14,20 67:17
67:22 68:13
69:12 70:5,8
70:13 72:6,15
73:9 74:23,24
78:18,25 79:1
79:21 80:4
85:18 89:10,15
93:23,25
**correctly (7)**
21:20 25:17
28:15 48:2
58:22 72:16
78:22
**corresponden...**
3:15 19:18
20:16
**cost (3)**
71:7 72:1,2
**counsel (3)**
90:12 96:13,15
**counterclaim ...**

16:20,23
**COUNTY (2)**
95:3 96:4
**couple (1)**
87:14
**course (6)**
9:17,17,22 10:3
36:4 71:21
**courses (5)**
9:1,15,20 10:1,4
**court (14)**
1:1 4:3 14:11
40:19 43:7
44:16 51:2
56:19 91:13,17
94:4,8,10
97:14
**Court's (2)**
49:12 52:25
**Courts (2)**
50:25 51:11
**cover (9)**
49:5 50:9 70:21
71:14,22 76:12
76:16 92:21,22
**coverage (17)**
10:13,24 26:4
28:9 48:21
52:5,15,21
53:9 65:15,23
67:7,19 71:25
76:11 77:5
90:7
**covered (12)**
49:9,18,22 50:1
50:9,17,17,21
51:18 66:9
77:15,18
**covers (6)**
49:5 70:3,12
71:18,20 72:8
**CPCU (2)**
8:19,21
**critical (3)**
25:16,19,25
**cross (1)**
91:2

**cruise (1)**
58:13
**cruises (1)**
58:20
**crystal (6)**
68:9,18 75:3,4
75:23 76:7
**curious (4)**
68:7,19 75:21
81:4
**customary (3)**
69:15 70:19,19
**CV (1)**
12:10

**D**

**D.C (1)**
8:2
**damage (3)**
70:12 84:6,19
**damaged (1)**
83:15
**data (1)**
14:23
**date (5)**
15:23 16:16
20:9 37:5
98:25
**DATED (1)**
96:18
**day (15)**
38:12,16 39:1,2
61:14 72:14,24
73:1,6 74:3
90:11 95:10,12
96:18 97:7
**days (1)**
97:13
**deal (2)**
11:9 27:23
**dealing (3)**
7:10 10:22
11:19
**dealt (2)**
28:2,22
**Dean's (1)**
8:3

**death (3)**
74:4,5 92:21
**decide (1)**
50:8
**decided (1)**
20:7
**decision (1)**
8:8
**declare (1)**
98:22
**deep (1)**
54:22
**defend (6)**
90:19,20,25
91:19 92:2,13
**Defendant (1)**
2:8
**Defendants (1)**
1:9
**defense (7)**
5:10,12 29:20
29:21 85:15
90:10 91:10
**defenses (2)**
16:20,23
**define (4)**
54:6,16 59:16
60:2
**definition (6)**
27:23 35:16
42:25 61:16
64:12 65:18
**Delray (1)**
82:25
**depending (1)**
71:2
**depends (1)**
58:1
**depo (1)**
13:3
**deposed (1)**
55:23
**deposition (13)**
1:12 17:16,18
25:7 56:1,14
56:22 73:12
74:12 86:11

96:8 97:8,12
**depositions (4)**
14:10,15 56:3
  56:17
**describe (1)**
87:11
**described (1)**
64:5
**DESCRIPTI...**
3:9
**designation (5)**
8:13,14,23 9:12
  9:18
**destroy (1)**
14:13
**detail (2)**
38:22 80:16
**details (1)**
39:14
**determination...**
44:17 53:21
**determine (6)**
49:18,20 52:25
  60:9 91:13,16
**determined (1)**
49:8
**determining (1)**
53:7
**device (27)**
11:17,17 26:21
  26:23 27:5,7
  27:24 28:24
  29:5,6 30:2
  62:20 63:2,8
  63:10,13,14,17
  65:2,14 66:15
  67:1 72:14
  73:1 76:2
  92:10,18
**devices (10)**
11:25 62:18
  65:12,24 66:10
  76:11 88:6,16
  88:23,24
**die (1)**
55:17
**died (5)**

55:13,19 57:1,3
  57:6
**differ (1)**
44:9
**difference (3)**
27:17 68:15,22
**different (11)**
4:25 9:1,15
  26:11 41:13,14
  45:1 69:20
  77:11 87:12,12
**DIRECT (2)**
3:3 4:14
**directives (1)**
10:13
**directors (1)**
84:11
**disagree (1)**
44:16
**discuss (8)**
17:4 25:15
  30:14,21 31:2
  31:10,10,14
**discussed (4)**
29:24 37:8
  71:15 92:8
**discusses (2)**
26:4 30:10
**discussing (3)**
26:13 37:25
  77:20
**discussion (2)**
17:2 38:3
**discussions (1)**
79:14
**distinguished ...**
47:3
**distribution (1)**
97:11
**DISTRICT (2)**
1:1,1
**divide (1)**
5:5
**diving (1)**
66:7
**DIVISION (1)**
1:2

**divorce (1)**
88:1
**Dmiszewicki (1)**
3:12
**Docket (2)**
13:12,12
**document (9)**
21:11 23:9,21
  24:13 32:14
  39:25 56:18
  67:18 98:22
**documentatio...**
3:14
**documents (8)**
11:6 21:9 24:23
  34:17 40:10,13
  56:5 75:25
**dog (1)**
43:13
**doing (11)**
6:21 7:16 18:9
  22:2 25:12
  27:20 48:3,12
  60:13 76:3
  87:1
**dollars (2)**
71:7 87:14
**door (1)**
46:25
**doubt (1)**
69:6
**Down's (1)**
74:2
**Down/USLI (1)**
6:3
**draft (2)**
17:7,10
**drafted (2)**
14:6 89:15
**drafting (1)**
89:10
**drawings (1)**
15:11
**drew (1)**
25:1
**drive (3)**
20:4,7 22:19

**drop (1)**
61:9
**dropped (2)**
55:22 61:8
**drown (1)**
77:1
**drowned (6)**
27:3 61:6 62:1
  72:20 74:23
  76:16
**drowning (9)**
55:14 62:2
  76:13,15 77:5
  77:9,13,17,18
**drowns (1)**
76:21
**duly (2)**
4:12 95:10
**duty (5)**
90:19,25 91:19
  92:2,12

─────────
          **E**
**e-mail (5)**
3:11 19:24
  30:11 37:5
  89:21
**earlier (3)**
13:1 59:7 74:11
**earnings (1)**
90:11
**easier (1)**
22:2
**easy (1)**
22:4
**edge (1)**
43:14
**education (1)**
66:8
**educational (3)**
7:20 8:6,10
**effect (2)**
39:4 67:20
**effects (1)**
66:1
**effort (1)**
35:16

**eight (4)**
5:2 7:16,18
  86:12
**either (6)**
6:17 7:7 33:15
  40:13 70:4
  71:1
**Eleanora (1)**
3:11
**employee (2)**
96:13,14
**endorsement (6)**
68:9 71:6,7 75:3
  76:9 80:15
**endorsement/...**
68:4
**endorsements ...**
24:1,6,8 68:23
  70:8 71:1,17
  71:19 72:7
  76:19 89:18
  90:21,23
**English (2)**
50:3 51:8
**ENTER (1)**
98:1
**entire (4)**
8:3 12:16 14:25
  79:5
**Entries (1)**
3:10
**Entry (2)**
13:12,12
**envision (1)**
76:20
**Errata (3)**
3:6 97:10 98:1
**ESQ (2)**
2:5,11
**Esquire (1)**
97:2
**event (1)**
38:15
**events (3)**
28:11 66:2,4
**everybody (2)**
28:16 84:6

**evidence (5)**
55:19 57:1,5
73:2 74:21
**exactly (5)**
37:20 49:20
55:16 63:16
90:22
**exam (2)**
10:4,5
**EXAMINATI...**
3:3 4:14
**examinations ...**
8:12
**examined (2)**
4:12 12:15
**example (10)**
39:1 42:2 44:12
46:4,20 61:4
69:20 71:5,24
89:15
**exceptions (1)**
70:12
**excerpts (1)**
56:16
**excess (2)**
6:24 7:1
**exclude (5)**
40:25 41:10
48:20 71:2
90:24
**excluded (9)**
43:17 65:15
68:5,21,21
69:3,10,10
79:25
**excludes (2)**
89:9 91:24
**excluding (2)**
76:19 89:4
**exclusion (26)**
11:17,19,21,24
24:16,18,19
25:3,22 26:10
26:21,23 28:9
28:21 30:2
41:5 53:7
68:10,23 76:10

76:14 77:8
80:15 88:16,22
92:11
**exclusionary (1)**
67:6
**exclusionator...**
67:5
**exclusions (27)**
12:3 26:13 52:4
52:14,20 53:16
54:11,16 69:7
70:7,10,11,23
71:16,19 72:6
72:7 77:6
78:10,16 88:6
91:19,23 92:8
92:11,17,24
**excursions (1)**
58:17
**excuse (4)**
10:3 16:11
67:10 69:5
**execute (1)**
97:10
**Executive (1)**
1:17
**exercise (1)**
47:10
**Exhibit (5)**
3:9 18:2 19:25
39:20 40:22
**EXHIBITS (1)**
3:8
**exist (1)**
41:15
**exists (1)**
54:19
**expect (1)**
40:8
**expenses (4)**
90:8 91:8,25
92:5
**experience (2)**
58:10 89:8
**expert (17)**
3:13 5:1,7,9
7:17 14:18

16:25 17:3,5,7
17:10,12 19:6
19:8,10,16
53:15
**experts (1)**
19:13
**Expires (1)**
95:25
**explain (2)**
5:14 27:16
**explicit (2)**
76:10 80:14
**exposed (1)**
36:24
**exposure (3)**
71:23 82:15
83:2
**expression (1)**
79:10
**extra (1)**
71:7
**extremely (2)**
70:20 71:13

───────
**F**

**fact (6)**
71:15 73:8
75:17 76:4
77:23 79:14
**facts (3)**
13:13 73:17
98:22
**FAIA (1)**
10:21
**fair (5)**
20:12 56:15
59:25 74:10
77:25
**fairly (1)**
10:19
**falling (2)**
69:19,22
**falls (1)**
69:25
**familiar (1)**
90:17
**far (4)**

5:9 15:17 18:11
21:3
**Farr (1)**
83:23
**fast (1)**
64:8
**favor (7)**
52:4,15,21 53:8
67:7,13,14
**federal (1)**
87:18
**feel (2)**
5:23 9:11
**feet (1)**
54:21
**fell (2)**
76:24,25
**felt (12)**
9:11 26:22
30:21 31:14
38:13,14 59:24
68:19 69:6
75:22 76:2,3
**FF (1)**
95:24
**field (5)**
5:4 8:9,11 9:3
27:19
**fighting (1)**
84:6
**figure (5)**
24:21 50:20
51:3,17 63:18
**figured (1)**
26:25
**file (15)**
3:15,16 12:16
14:13,25 15:8
16:10,14 20:23
21:21 22:6,7
22:11 31:21,24
**filed (4)**
13:14 14:11
56:18 97:13
**fill (1)**
38:11
**film (1)**

66:1
**finally (1)**
78:21
**finance (2)**
8:2 9:19
**financially (1)**
96:16
**find (9)**
6:17,20 22:5,9
34:9 73:16,22
77:24 88:9
**finding (1)**
73:18
**fine (1)**
94:13
**finish (2)**
16:24 37:13
**Fire (4)**
1:8 3:12 97:6
98:2
**firearms (3)**
36:6,9 48:21
**firm (7)**
5:14,24 6:8 7:14
9:2 37:24,25
**first (11)**
4:12 22:24 30:8
34:1,22 35:4
44:1 78:9
81:12 90:12,15
**fit (4)**
6:4,6,10,14
**five (1)**
8:25
**FL (3)**
2:4,10 97:4
**flag (3)**
28:18,19,19
**flagged (1)**
29:15
**flesh (1)**
63:5
**flip (1)**
22:24
**flipped (1)**
40:21
**flood (1)**

83:13
**Floor (2)**
2:9 97:4
**Florida (12)**
1:1,4,18 4:22
7:6 10:20 53:4
95:2,23 96:3,6
97:19
**Fly (1)**
66:1
**focusing (1)**
39:6
**folks (2)**
36:7 65:12
**following (3)**
4:2 30:12 35:9
**follows (1)**
4:13
**football (6)**
28:15,16,18,19
28:19 41:17
**foregoing (1)**
98:22
**foreign (1)**
1:8
**forget (2)**
5:25 28:15
**forgot (1)**
18:25
**form (75)**
6:11,11 11:4
27:12 30:18
33:7,17 34:19
36:17 38:5,17
38:24 39:15
41:3,12 43:1
43:19 44:11
45:4,10,20
46:13,23 47:23
48:5,24 49:11
49:23 50:12,23
51:12,20 52:1
52:6,8,16,24
53:11,24 55:8
57:10 58:12
59:18 60:20
62:16 63:24

64:1,11 65:4
65:19 66:11
67:2,8,21
69:11 70:6
73:3,10 77:7
78:4,12 80:5
80:12,17,22
89:5,11,16
90:1,24 91:12
92:15,23 93:18
93:24
**formal (1)**
15:19
**formatting (1)**
14:23
**formulated (2)**
33:2,3
**formulating (1)**
56:25
**Forrester (3)**
34:24,24 37:9
**Fort (3)**
2:10 85:4 97:4
**forth (4)**
27:8 47:6 66:17
66:23
**fortunate (1)**
5:11
**fortune (1)**
87:20
**Forum (1)**
97:19
**forwarded (1)**
97:13
**fought (1)**
86:8
**found (4)**
68:23 86:2
92:20 97:11
**four (6)**
55:22 73:13,13
74:2,13,19
**FOWLER (2)**
2:8 97:3
**FPR (4)**
1:24 95:21
96:24 97:18

**front (1)**
46:25
**full (2)**
72:5 94:6
**fundamentals ...**
9:19
**further (3)**
24:20 29:16
96:12
──────────
G
──────────
G-E-N-E-S-E-...
30:9
**Gallagher (1)**
83:24
**game (5)**
28:14,14,18,19
28:20
**games (2)**
30:2 88:22
**Gary (2)**
5:25 38:3
**Gateway (1)**
1:18
**gather (1)**
35:7
**geared (1)**
19:12
**general (20)**
5:19 6:2,7 30:9
34:23,25 37:19
40:3,14 64:15
64:17 69:16,24
69:24 70:3,15
71:8,17,21
72:8
**generally (2)**
70:3,12
**Genesee (9)**
6:2,7 30:9 34:23
34:24 37:19
40:3,14 89:24
**George (2)**
7:21 8:1
**getting (6)**
27:21 31:6 82:9
86:6 88:1 93:3

**give (7)**
4:6 7:19 15:15
15:24 17:22
44:12 46:20
**given (3)**
14:6 38:6 75:25
**GL (10)**
69:15,15 70:20
71:11,13,16,17
71:25 72:2,8
**Glades (1)**
4:21
**glasses (1)**
13:18
**go (28)**
8:9 13:20,22
17:6,9 18:17
19:5,23 26:16
31:5 39:18
40:11,18 41:18
58:17 60:12,16
62:25 64:3,7
66:23 68:6
73:11 79:2
80:25 81:9
82:21 87:20
**goes (6)**
27:7 58:2 63:2
64:6 66:17
82:17
**going (31)**
7:22 14:8 15:10
20:12 22:5
24:4 29:23
36:8 37:22
38:25 42:5
50:1,8 52:13
52:22,25 54:17
63:5 68:1
70:10 71:7,25
72:1,2 74:25
84:7 86:1
87:10 88:4,8
90:5
**golf (5)**
35:25 36:4
41:17 42:3,3

**good (3)**
42:17 48:9
49:21
**gotcha (2)**
56:15 92:7
**gotten (2)**
9:4 45:25
**grab (2)**
43:14 61:5,15
62:1
**grabbing (1)**
62:12
**grades (1)**
7:25
**graduated (1)**
8:2
**granting (1)**
67:7
**graphs (1)**
15:12
**greater (1)**
80:16
**grill (1)**
85:12
**Gross (90)**
2:11 11:4 13:2
18:22 19:1,5
23:6 25:15
27:12 30:18
31:5 32:1,4,7
32:10 33:7,17
34:19 36:17
38:5,17,24
39:15 41:3,12
43:1,19 44:11
45:4,10,20
46:13,23 47:23
48:5,24 49:11
49:23 50:12,23
51:12,20 52:1
52:6,9,16,24
53:11,24 55:8
56:6,9 57:10
58:12 59:18
60:20 62:16
64:1 65:4,19
66:11 67:2,8

67:21 69:11
70:6 73:3,10
73:21 75:8,11
75:15 77:7
78:4,12 80:5
80:12,22 89:5
89:11,16 90:1
91:12 92:15,23
93:18,24 94:3
94:12 97:2
**ground (1)**
54:21
**Group (1)**
38:9
**guess (2)**
76:23 87:1
**guy (1)**
87:17
**gymnastic (1)**
65:24

―――――――――  **H**
**half (1)**
13:2
**half-hour (1)**
73:12
**hand (2)**
4:3 40:14
**handle (11)**
61:5,15 62:1,3,7
62:12 72:19
76:1 93:3,4,16
**handling (1)**
8:19
**handwriting (1)**
22:20
**handwritten (2)**
3:10 15:21
**happen (3)**
71:21 85:7 93:9
**happened (4)**
49:20 55:16
64:2 77:3
**happening (2)**
45:7 69:20
**happens (2)**
18:16 27:6

**happy (3)**
14:25 17:22
40:10
**hard (2)**
66:22 81:10
**harness (2)**
57:25 58:6
**harnessed (1)**
66:4
**hate (3)**
31:21 57:13
73:11
**hazard (9)**
35:21,23,23
36:3 59:20,25
60:3,7 77:21
**hazards (11)**
30:16 31:13,17
31:18 35:15,17
37:16 79:21,24
79:24 80:3
**headers (1)**
23:13
**health (1)**
7:7
**hear (3)**
33:9 48:2 62:11
**heard (4)**
58:21 65:6,9,10
**hearing (1)**
58:22
**heart (1)**
47:6
**help (1)**
35:5
**helpful (1)**
13:22
**high (2)**
7:22,23
**higher (2)**
8:19 71:23
**highlighted (6)**
30:15 37:15
38:11 39:23
59:23 91:4
**highlighter (1)**
23:4

**highlighting (2)**
23:15,16
**hired (2)**
83:23 84:10
**hockey (1)**
41:17
**hold (5)**
7:2,3,3,5 79:10
**holder (1)**
87:6
**holding (1)**
62:2
**home (1)**
18:17
**horror (1)**
86:4
**horses (1)**
66:20
**hour (3)**
13:2 18:13,14
**hours (3)**
17:17 18:10
86:12
**huh (1)**
86:1
**hunting (3)**
36:7,9 48:21
**hurricane (2)**
86:17,18
**hurricanes (1)**
83:15

―――――――――  **I**
**illustrations (1)**
15:12
**importance (1)**
67:20
**incident (3)**
49:9,18,19
**incidental (2)**
93:17,23
**include (4)**
65:24 70:23
71:1,10
**included (2)**
37:15 79:25
**including (2)**

54:4 90:10
**incorporate (1)**
56:18
**incorporated (...**
13:8 23:18 40:4
**incur (1)**
91:9
**incurred (1)**
90:8
**INDEX (1)**
3:1
**Indiantown (1)**
2:4
**indicated (9)**
33:13 35:9
65:14,22 67:24
68:3 70:18
75:2 90:4
**indicates (4)**
34:25 63:20
79:20 90:7
**indicating (2)**
15:13 74:13
**individual (3)**
47:7 65:16 86:4
**industry (2)**
67:18 70:1
**inflated (2)**
66:3,5
**information (8)**
22:25 24:25,25
35:6,11 36:7
38:6 56:22
**Infrequently (1)**
36:1
**injured (3)**
28:12 59:8
93:10
**injuries (1)**
70:4
**injury (2)**
77:14 93:11
**instance (5)**
11:16 36:13
41:13 45:12
60:14
**instances (3)**

46:10,16 50:1
**Institute (5)**
8:14,16 10:7,11
10:16
**insurance (74)**
1:8 3:12 4:25
5:4,6,8,14,16
5:17,18,19,22
6:17,19 7:4,10
8:9,11,14,16
8:17,20 9:3,19
9:21,21 10:7
10:11,15,20
11:2,12 27:19
32:23 38:9
39:7 42:18
49:24 50:7
51:16,18 53:3
53:4,14 65:7
67:18 68:24
70:1 71:23
80:20 82:12
83:4,13 84:11
84:15,18,20,24
85:16,17 86:5
86:7,7,17,18
87:21,23,24,25
89:3,6,9 97:6
98:2
**insured (17)**
5:25 32:22
36:12 49:21
50:7,16,19,24
51:3,4,16,22
67:7,13,15
70:5 90:8
**insureds (1)**
51:10
**insurer (3)**
51:4 52:5 53:10
**insuring (1)**
87:14
**intended (2)**
65:17 80:8
**intending (1)**
62:12
**intent (1)**

62:1
**interactive (2)**
30:2 88:22
**interested (4)**
9:9 47:7 81:6
  96:16
**interesting (1)**
87:9
**interpretation...**
49:12
**interpreted (2)**
12:2,3
**interpreting (1)**
52:12
**investigate (1)**
24:20
**investigation (2)**
90:9 91:10
**involve (1)**
82:12
**involved (9)**
8:18 29:13 48:3
  48:7 61:11
  76:5 82:15
  84:22 85:9
**involves (2)**
9:1,18
**issuance (1)**
67:19
**issue (5)**
10:12 11:1 28:3
  28:23 93:3
**issued (2)**
65:11 67:20
**issues (7)**
10:22 11:9,11
  36:12 38:1,4
  93:14
**Italian (2)**
83:11,18
**item (3)**
21:21 63:1
  77:19
**items (3)**
13:16,16 30:12
**Ivanovski (1)**
3:11

**J**

**January (3)**
34:23 37:6
  89:20
**job (1)**
22:17
**Judge (1)**
27:16
**judgment (2)**
13:14 56:7
**July (6)**
1:16 95:10,12
  96:18 97:1,7
**jump (1)**
63:8
**jumping (1)**
63:7
**Jupiter (1)**
2:4
**jurisdiction (1)**
82:9

**K**

**keep (6)**
9:6 14:8 15:10
  20:12 25:9
  39:24
**keeps (1)**
31:6
**kind (7)**
6:15 11:1 28:16
  66:21 76:23
  85:5,6
**kindergarten ...**
7:25
**kinds (1)**
10:13
**Kings (2)**
86:19,19
**know (38)**
7:24 10:12,24
  11:3 12:8,21
  18:24 27:3,6
  29:6 31:20,23
  41:18 47:18
  48:12 49:19,20
  49:20 50:1

51:7 52:3
55:18 56:21
58:20 61:9
63:25 66:19
69:20 73:20
79:24 86:9
88:10,13,13,14
88:15 91:5
94:11
**knowledge (10)**
56:24 57:20,22
  57:24 58:15,23
  59:1 62:23
  64:15,17
**Kristy (3)**
30:10 34:25
  37:7

**L**

**L-433 (1)**
88:18
**L-607 (1)**
88:21
**L536 (1)**
68:4
**lack (3)**
50:3 52:17
  70:25
**lake (7)**
20:24 54:20
  55:3,6 59:24
  62:7 93:22
**lakes (1)**
43:17
**language (3)**
67:6,12 69:2
**lapse (1)**
88:3
**large (1)**
10:2
**lasted (1)**
86:11
**Latin (2)**
63:21,22
**Lauderdale (3)**
2:10 85:4 97:4
**launching (1)**

66:3
**law (4)**
2:3 9:10 23:19
  53:4
**lawyer (1)**
86:10
**lawyers (2)**
22:13 56:17
**learning (1)**
43:12
**left (1)**
69:6
**legal (1)**
52:9
**let's (6)**
43:24 59:20
  62:18 66:24
  77:19 84:12
**letter (3)**
3:6 88:23 97:15
**liabilities (1)**
87:2
**liability (20)**
5:19 38:9 69:16
  69:24 70:3,16
  71:6,8,10,24
  71:25 81:15,16
  82:15 83:1
  85:3,20 87:3
  87:16,17
**liable (1)**
92:20
**liberally (2)**
52:4 53:8
**license (9)**
6:12,24,25 7:1,4
  7:5,7,9 87:6
**licenses (3)**
7:2,3 8:12
**life (4)**
7:7 87:23,24,25
**Lillo's (1)**
83:17
**limit (3)**
81:16,18,18
**line (34)**
27:1 55:17,20

55:23 57:2
61:2,5,8,9,14
61:17 62:4,8,8
62:13,14,19
63:24 64:6
65:1 72:20,24
73:6,9,14 76:2
93:4,6,6,10,12
93:17,22 98:4
**lined (1)**
58:8
**lines (5)**
6:25 7:1 40:25
  41:1 58:23
**liquor (9)**
71:5,10,24,25
  85:3,19 87:2,3
  87:5
**Liquors (1)**
87:4
**list (9)**
8:3 21:12,22
  41:14,15,16
  54:17 77:13,17
**listed (12)**
12:21 13:16
  20:3 22:7 24:6
  27:8 41:21,24
  79:6,13 81:24
  97:16
**lists (1)**
77:14
**little (9)**
12:13 20:3
  22:22 45:25
  49:15 55:21
  83:10 85:25
  87:12
**located (3)**
10:8 20:23
  21:15
**long (4)**
18:3 37:14 77:6
  86:13
**longer (4)**
60:10 61:1 91:1
  92:2

**look (3)**
34:12 39:10
89:22
**looked (2)**
34:10 55:25
**looking (6)**
24:24 32:16
53:6,15,16
75:9
**looks (7)**
18:7 26:3 30:10
32:7 37:18
38:10 57:14
**lose (2)**
47:5,19
**loss (3)**
27:25 28:2
90:10
**lost (2)**
18:16 87:20
**lot (7)**
71:18,20 72:9
81:17 85:8
86:16,17

_____ M _____
**main (2)**
80:17 90:24
**making (1)**
43:13
**Malvern (2)**
8:15 10:10
**management (1)**
8:13
**manner (1)**
22:15
**March (1)**
20:11
**mark (5)**
19:23 23:3 25:2
39:18 40:12
**marked (4)**
18:2 19:25
39:20 40:22
**Marsh (2)**
84:1,4
**massive (1)**

83:14
**material (3)**
13:13 33:14
78:1
**materials (8)**
12:7,21,23 20:2
22:12 34:10
59:23 89:22
**math (1)**
27:20
**matter (2)**
4:6 8:20
**matters (2)**
8:17 9:21
**Maxwell (5)**
1:24 95:21 96:6
96:24 97:18
**McCauley (1)**
81:23
**McClennan (1)**
84:1
**mean (14)**
19:2 29:1,6 39:7
61:3 69:17
80:9,20 85:16
86:2 87:20
88:10,13 91:7
**meaning (3)**
29:21 31:10
45:1
**means (10)**
5:15 22:25 31:2
38:23 42:20
53:22 54:5
78:23 88:14
90:13
**meant (1)**
74:14
**mechanical (14)**
11:17 24:16
26:10 28:22,24
29:5,6 72:14
72:25 75:18
76:2,11 92:9
92:17
**medical (3)**
26:3 78:23 80:9

**Meeting (1)**
17:15
**memo (1)**
89:21
**memorandum...**
10:24 23:19
30:9 34:23
37:8 65:23
**memorandum...**
10:13
**mentioned (1)**
85:3
**merry-go-rou...**
60:15,16,22
**merry-go-rou...**
60:18
**method (1)**
30:12
**MGAs (1)**
87:11
**middle (2)**
6:5 85:5
**mince (1)**
29:2
**mind (1)**
69:6
**minute (3)**
43:6 45:23
59:21
**minutes (1)**
56:9
**misrepresenta...**
78:1
**misrepresenta...**
33:14
**missed (3)**
81:16,18 90:5
**mistake (1)**
74:1
**misunderstan...**
72:4
**Mitchell (3)**
30:10 34:25
37:7
**MOC (1)**
65:23
**modifying (3)**

45:8,18,18
**moment (2)**
71:17 79:3
**moments (1)**
29:25
**money (1)**
81:17
**morbid (1)**
76:23
**motion (4)**
13:13 16:6,9
23:18
**Mount (24)**
1:8 13:14 22:13
33:15 40:13,25
43:16 48:20
52:22 53:17,20
54:5,11 56:17
76:12 80:8,13
88:5 89:24
90:7 91:7,9
92:12,22
**move (5)**
45:14 62:24
77:19 82:22
84:12
**moves (1)**
63:1
**Moving (3)**
37:3 39:22 78:8
**Mt (2)**
97:6 98:2
**multiple (2)**
19:13 49:25
**municipal (1)**
82:8

_____ N _____
**N/A (6)**
14:1 20:13,20
20:21,22 21:7
**name (5)**
4:16 6:1 59:7,15
97:15
**necessarily (5)**
42:8 50:24
67:14 70:22

73:5
**need (13)**
6:23,24 9:16
15:4 30:13
31:10 35:1,5
50:16 54:10
68:20 75:22
77:16
**needed (2)**
30:21 31:14
**needs (1)**
51:6
**never (6)**
10:15 15:20
42:19 61:14
65:9,10
**New (2)**
8:8 83:24
**nice (1)**
85:25
**nicer (1)**
22:17
**nightclub (1)**
71:9
**nine (1)**
68:4
**nodding (1)**
17:25
**nonresponsive...**
45:15
**Notary (1)**
95:23
**note (5)**
15:4 23:22
30:20 31:9
34:22
**notes (5)**
14:22 15:9 17:6
17:9 96:11
**notice (3)**
21:16 88:4 97:7
**noticed (1)**
21:10
**number (44)**
12:10 13:24,25
14:2,5,9,17,22
15:11,13 18:1

18:19 19:19
20:13,15,17,20
20:21,22,23
21:7,10,12,22
22:5 40:12
72:12 75:1
77:19 78:8
79:2 82:23,25
83:10,20,22
84:13,14,15
85:14,19 86:15
87:3 90:7
**numbered (1)**
22:3
**numbers (1)**
7:6

**O**

**O'Quan (10)**
25:21 48:12
55:13 57:1
61:13,25 62:6
62:11 74:13,22
**OATH (2)**
3:5 95:1
**objected (1)**
18:25
**objections (3)**
12:8 18:23 19:3
**obviously (7)**
8:11 14:10
17:24 75:18
81:9,17 83:14
**occasions (4)**
28:6,7,8 58:19
**occur (1)**
70:4
**occurred (2)**
78:2 79:14
**occurring (1)**
45:12
**occurs (3)**
49:9,19 50:2
**office (4)**
17:16 38:3
57:13 69:19
**officers (1)**

84:11
**OFFICES (1)**
2:3
**Oh (9)**
19:22 33:10
56:8 74:25
75:13,15 82:21
91:22 92:3
**okay (134)**
5:3,20 6:9 8:5
11:11,16 12:2
12:17,25 13:5
13:15 14:4,5,8
14:14,16 15:10
15:22 16:18
17:21 18:18,21
18:24 19:4,17
20:9,12,14
21:6,18,21
22:9,12,15
23:1,17,25
25:3,25 26:9
26:19 27:22
28:21 29:1,4,8
30:1,5 31:9
32:21 33:1,13
33:20,24 34:9
35:19 37:3,18
37:21 38:8,20
39:6,18 42:23
44:8,16 45:23
46:4 47:2,17
48:9,20 49:14
52:19 53:3
54:20 55:2
56:13 57:8
58:5,8,22 59:3
60:2,5,8,14
61:3,7,10,13
61:19,25 64:5
64:12,16 65:11
68:12 69:4
71:12 72:11
74:6,18 75:13
76:6 77:2,5,19
78:19 79:7
80:8 81:19

82:3,6,18,24
83:6,9,19 84:3
84:13,17 86:14
86:23,25 87:8
87:22 89:20
90:18 91:7
92:3 93:8,14
94:3
**Olympic (1)**
46:11
**once (7)**
6:20 10:5 37:4
37:21 65:17
67:20 72:13
**one's (1)**
19:12
**ones (2)**
18:25,25
**operates (1)**
64:6
**operating (2)**
72:14,25
**opinion (25)**
12:4 14:18
29:18,20 43:10
44:10 56:10
61:13 62:3,9
62:19 63:3
72:21,24 78:6
78:9,15,21
79:6,17 80:4
92:12 93:7,8
93:10
**opinions (8)**
12:4 13:9 14:23
30:25 33:2,3
56:25 79:13
**opposed (5)**
39:10 68:21
69:2 75:4,23
**order (4)**
22:3 24:23 35:8
35:12
**ordered (1)**
97:9
**ordering (1)**
97:13

**organization (1)**
10:25
**organizations ...**
10:17
**organized (1)**
47:9
**original (2)**
58:2 97:13
**oscillates (1)**
65:16
**outdoors (3)**
36:13,21,23
**overnight (2)**
30:23 36:11
**owns (1)**
85:4

**P**

**P.A (3)**
2:3,8 97:3
**p.m (4)**
1:16,16 4:2
94:15
**PA (1)**
10:10
**pad (1)**
66:3
**padded (1)**
66:4
**paddling (1)**
43:13
**page (19)**
3:2,9 22:24
23:22 24:1,13
26:2,11 68:2
70:19 72:11,12
75:1,5 77:20
81:1 90:6 91:4
98:4
**pages (2)**
15:9 96:9
**paid (1)**
88:2
**Palm (4)**
1:2 95:3 96:4
97:19
**paper (4)**

20:6,7 23:7,11
**papers (2)**
17:6,9
**paragraph (2)**
72:12 75:1
**pardon (2)**
50:3 79:10
**park (2)**
39:1,3
**part (7)**
11:12 18:8 19:2
20:25 56:10
66:7 78:9
**participant (2)**
66:3,5
**participate (3)**
36:8 79:20 80:3
**participating (...**
42:12,24 43:9
43:14,17 46:17
46:21 47:8
60:8,10
**participation (...**
25:4
**particular (17)**
9:8 10:22 11:1
15:9 23:22
41:5,15 45:12
50:20 51:17
71:6 76:3
79:17 82:9,11
89:15,17
**parties (2)**
96:14 97:11
**parties' (1)**
96:15
**pass (2)**
9:16 21:25
**passed (3)**
8:11 10:6 40:13
**pathway (1)**
66:5
**Paula (2)**
37:8,18
**pay (5)**
84:7,20,21,21
90:8

**payment (3)**
15:19 78:23
80:9
**payments (2)**
26:4 90:6
**PDF (1)**
94:6
**penalties (1)**
98:22
**pending (1)**
67:19
**Pennsylvania ...**
8:15
**Pensacola (2)**
83:12,18
**people (9)**
6:17 8:9 42:3
46:17 47:4
55:22 58:13
74:19 86:2
**percent (4)**
5:6,7,13 73:5
**perch (1)**
63:13
**period (4)**
8:7 9:16 14:13
74:9
**perjury (1)**
98:22
**person (9)**
28:12 35:6 37:7
47:19 54:20
60:10 64:8,10
87:23
**personally (1)**
95:9
**Phipps (1)**
97:18
**photographs (3)**
20:24 21:3,4
**phrase (2)**
33:16 72:5
**physical (46)**
11:20 25:4,8,24
28:3 29:9,14
43:2,5,24 44:6
44:9,13,19,20

44:23 45:2,8
45:17 46:1,21
47:10,14,16,22
48:4,7,10,13
53:25 54:4,18
54:24 59:9,11
59:16 66:8
68:10 76:22
77:14 78:24,24
80:10 92:10,18
92:19
**physically (2)**
64:7,25
**piece (2)**
23:7,11
**pier (1)**
83:12
**Ping-Pong (1)**
41:18
**place (13)**
5:18,21 6:25
27:7 57:25
62:24,25 63:1
63:12 64:3
70:4 73:25
97:19
**placement (1)**
6:19
**plain (1)**
51:8
**plaintiff (9)**
1:6 2:3 3:8 5:10
5:12 18:2
19:25 39:20
40:22
**plaintiff's (5)**
16:6,8,20,24
23:18
**platform (3)**
64:8,10 65:1
**play (2)**
35:25 42:3
**playground (1)**
66:14
**playgrounds (1)**
66:20
**playing (2)**

28:13,14
**plays (1)**
28:17
**please (10)**
4:4,16 7:20
14:25,25 15:1
94:6 97:7,10
97:15
**plus (5)**
8:25 18:10,10
18:11 49:25
**point (4)**
48:9 55:6 60:17
60:21
**police (2)**
20:25 55:15
**policies (7)**
11:13,23 51:7
52:3 69:15
70:20,25
**policy (88)**
10:12 11:16
16:5 21:10,14
25:22 26:3
35:2,3 38:1
41:2 43:17
44:17 48:10,22
48:22 49:4,10
49:17,21 50:4
50:7,10,16,20
50:21 51:3,6
51:16,18 52:3
52:13 53:22
54:10,23,25
55:4 59:16
60:9 61:16
63:3 67:19,20
68:5 69:8,15
69:18,25 70:3
70:8,16 71:2,6
71:8,11,13,16
71:17 72:1,2,8
72:8 75:2,12
76:12,15,16
77:13,16,17,18
78:1,2 80:17
80:20 88:2,5

89:3,9,14,17
90:6,19,25
91:1,19,20
92:2
**pond (2)**
59:24 60:25
**ponds (1)**
43:18
**pool (3)**
43:13 66:7 85:5
**poor (1)**
89:10
**poorly (1)**
89:15
**portion (2)**
45:15 48:16
**portions (1)**
78:15
**Post-It (1)**
15:9
**potential (3)**
35:21,22 51:21
**pound (1)**
47:19
**power (2)**
82:8,9
**practice (1)**
11:13
**practicing (1)**
9:2
**preclude (1)**
28:9
**preempt (1)**
91:19
**preempted (2)**
76:18 79:13
**prefer (2)**
44:12 73:22
**preferred (1)**
20:8
**preliminary (1)**
67:17
**premise (1)**
38:15
**premises (1)**
38:12
**Prep (1)**

17:18
**prepare (2)**
17:12 35:12
**prepared (1)**
14:23
**present (1)**
74:3
**pretty (2)**
74:8 87:9
**prevalent (1)**
29:12
**prevent (1)**
73:18
**previous (1)**
37:9
**Price (2)**
37:9,18
**primary (2)**
32:23 34:6
**prior (5)**
15:17 21:19,20
35:10 80:25
**prison (1)**
87:18
**probably (4)**
28:7 58:7 73:17
82:17
**problem (1)**
79:11
**proceedings (3)**
3:1 4:2 94:14
**process (1)**
88:1
**produce (1)**
79:16
**produced (3)**
33:22 56:2,3
**producing (3)**
19:2 79:18,19
**production (1)**
32:11
**professional (4)**
4:19,24 11:12
96:6
**professionally...**
14:6
**program (1)**

66:8
**Programs (1)**
65:7
**prohibit (1)**
53:23
**prohibited (2)**
53:25 54:6
**propel (1)**
66:3
**proper (1)**
50:3
**property (5)**
5:18 7:4 8:22
  60:15 87:15
**provide (2)**
38:22 39:14
**provided (8)**
14:19,20 20:3
  22:12,16,18
  23:8,10
**providing (1)**
22:17
**Public (1)**
95:23
**pull (1)**
22:1
**purpose (1)**
24:8
**purposefully (1)**
8:9
**purposes (1)**
91:2
**put (10)**
13:18 18:15
  24:4,5 31:3
  40:18 59:13
  61:20 71:16
  82:10
**putting (2)**
25:9 82:8

      **Q**
**qualifications ...**
6:13 9:13
**qualified (1)**
38:15
**qualify (1)**

7:9
**question (14)**
6:23 23:7 31:9
  32:19 34:1
  37:13 38:20
  45:14,17 48:14
  48:15 59:13
  64:16 88:14
**questions (5)**
35:1 37:10
  65:13 68:1
  79:22
**quick (1)**
18:22
**quickest (1)**
88:9
**quickly (3)**
13:22 74:8 81:6
**quite (3)**
24:2 29:18
  71:12
**quote (17)**
3:16 21:21 22:6
  22:7,11 31:25
  32:1 35:9
  39:22,24 40:1
  40:2,3,5,12
  62:7 65:13
**Quotes (1)**
32:7

      **R**
**R (2)**
2:11 97:2
**Raise (1)**
4:3
**rate (1)**
47:6
**Raton (1)**
4:21
**reached (1)**
62:13
**reaching (2)**
72:19 76:1
**read (42)**
3:6 15:22 16:2,4
  16:6,8,25 23:4

24:2,3 25:1,17
  29:19 35:4
  45:9 48:15,17
  55:21 56:14,16
  57:14 64:18,24
  67:25 72:15,17
  73:4,11,16
  74:8,8,16
  75:25 90:15,16
  90:22 91:3,4
  94:3 97:10,12
  98:22
**reading (7)**
24:22 50:10
  53:19 55:15
  58:10 78:21
  91:5
**reads (5)**
50:7,16,19 51:3
  51:16
**real (2)**
18:22 71:18
**realize (1)**
34:2
**realized (4)**
25:12 27:1
  33:24 34:4
**really (8)**
6:4 9:6 21:9
  22:6 66:22
  68:7 72:5
  74:14
**Realtime (3)**
1:25 95:22
  96:25
**reason (12)**
6:15 9:4,8 10:9
  23:23 24:17
  26:12 29:10
  37:16 59:22
  70:2 98:4
**reasonable (4)**
90:8 91:8,25
  92:5
**rebound (1)**
64:9
**rebounding (30)**

11:24 26:21,23
  27:5,7,24
  29:24 30:2
  62:18,20 63:2
  63:8,10,14,17
  63:20 64:11
  65:2,12,14,24
  66:10,15 67:1
  88:6,16,22,24
  92:10,18
**rebounds (1)**
65:16
**recall (9)**
9:23 21:13
  23:24 30:23
  31:15 34:11,14
  40:7 90:22
**received (1)**
13:1
**recess (3)**
31:7 61:23
  73:23
**recognize (3)**
8:16 46:11,16
**recognizing (1)**
24:8
**record (4)**
4:17 15:23 57:4
  96:11
**recorded (2)**
12:15 48:17
**records (1)**
15:13
**Reed (14)**
25:21,21 29:13
  48:12 55:13
  57:1 61:4,13
  61:25 62:6,12
  72:14 74:13,22
**Reed's (1)**
92:20
**refer (2)**
89:23 91:3
**referring (2)**
13:11 56:6
**refers (1)**
36:4

**regard (7)**
11:7,24 30:20
  35:15 36:11
  89:20 92:4
**regarding (4)**
25:4 26:3 53:4
  65:11
**regardless (1)**
41:23
**regular (2)**
71:20 72:2
**reimburse (1)**
91:8
**reimbursing (1)**
91:24
**related (10)**
9:19,20,21
  10:19 25:23
  35:1,7 77:15
  82:5 83:1
**relating (1)**
14:17
**relative (2)**
96:13,14
**rely (3)**
32:18,22 33:20
**remand (3)**
16:6,9 23:18
**remember (16)**
6:1 21:15,20
  22:8 24:22
  28:14 34:5
  81:10,11,11
  82:17,23 83:8
  83:10,20 86:24
**remembering ...**
26:18
**remotely (1)**
82:5
**Repath (1)**
81:23
**replace (1)**
87:21
**report (32)**
12:6,11,22
  13:16 14:17
  16:25 17:3,5,7

17:10,12 19:6
19:16 20:3
21:1,8 24:1,4,5
25:20 29:22
30:24 33:13
55:16 67:24
68:20 69:14
74:25 81:2
90:4 92:1 96:8
**Reported (1)**
1:24
**reporter (8)**
3:5 4:3 40:19
94:4,8,10 96:1
96:7
**Reporting (1)**
97:18
**represent (1)**
83:25
**represented (3)**
81:21,23 82:20
**representing (1)**
56:17
**Republic (1)**
1:17
**request (2)**
90:9 91:9
**requested (1)**
96:10
**required (1)**
35:10
**rescind (1)**
77:25
**research (1)**
35:16
**respond (1)**
67:10
**response (2)**
14:5 31:17
**rest (2)**
26:16 60:12
**restaurant (7)**
71:10 83:1,2,11
83:18 85:23,25
**result (6)**
57:2,3,6 62:2,3
86:9

**retail (1)**
81:13
**retained (1)**
85:23
**retracted (1)**
66:5
**return (2)**
64:7 97:16
**returned (1)**
97:11
**returns (1)**
65:1
**review (6)**
16:10,19,23
40:16 93:1
96:9
**reviewed (11)**
12:20,22,23
13:7 16:12,14
20:24 21:9
22:25 23:17
34:17
**ride (6)**
26:10 28:24
29:5 75:18
92:9,17
**Rides (1)**
24:16
**riding (3)**
11:17 28:24
29:5
**right (58)**
4:3 5:5 6:6 7:19
12:12 15:7
18:9,11 20:17
20:17 24:2,24
25:7 27:20
29:1 32:5,13
35:11,15,25
36:2 39:18,22
40:19 45:7
46:7 48:2
50:15,19 51:6
57:22 66:22
68:12,17 69:8
69:14 70:2,16
70:18 71:4

72:11 75:1,8
75:15 77:23
78:8 80:1
83:21 84:8
85:1,13 87:1
87:18 88:8,15
88:17 89:8
94:1
**risk (5)**
8:13 36:12,20
36:23 65:11
**Road (2)**
2:4 4:21
**Robyn (5)**
1:24 95:21 96:6
96:24 97:18
**root (2)**
63:21,22
**RPR (4)**
1:24 95:21
96:24 97:18
**Run (1)**
66:4
**rundown (1)**
7:19

───────────
**S**
───────────
**S (2)**
2:3,5
**saw (4)**
24:19 73:1,8,14
**saying (10)**
17:25 23:4 43:7
62:11 69:2
72:3 78:22
88:11 91:22
92:3
**says (13)**
15:2 25:15
26:20 29:17
30:14 35:5,23
38:22 64:24
68:12 69:14
73:8 75:10
**scenario (1)**
76:20
**school (2)**

7:22,23
**Schools (1)**
65:7
**Scott (11)**
1:13 3:3,11 4:11
4:18 95:9 96:8
97:2,25 98:3
98:25
**scratch (2)**
41:23 55:12
**second (3)**
14:4 75:13
81:25
**secondhand (2)**
58:23 62:23
**section (5)**
37:4 39:22
40:11 78:23
80:9
**sections (1)**
23:13
**see (20)**
13:20 14:24
21:23 23:3
24:7 26:15
27:10 29:15,15
32:2 40:5,8
66:24,24 68:15
77:21 85:20
88:10 91:22
92:3
**seeing (3)**
17:25 34:14
79:11
**seeking (1)**
35:12
**seen (10)**
10:15,17,19,23
11:6 12:11
13:6 21:5,13
33:11
**selected (1)**
56:18
**self-taught (1)**
57:20
**sell (3)**
7:10 50:7 83:12

**send (1)**
15:18
**sent (4)**
15:20 19:21,22
37:8
**sentence (8)**
35:5 68:6 72:4,5
75:2,11,14
78:10
**separate (1)**
88:5
**separated (1)**
31:20
**separating (1)**
47:21
**separation (1)**
44:23
**service (1)**
39:11
**services (2)**
38:21 39:6
**setting (1)**
41:25
**sgross@fowle...**
2:11
**shape (1)**
63:23
**Sheet (3)**
3:6 97:10 98:1
**ships (1)**
58:13
**Shore (1)**
82:25
**short (2)**
74:9 81:6
**show (5)**
14:25 21:23
32:13 88:9
90:12
**showed (2)**
20:15 29:11
**shown (1)**
75:17
**shuffle (1)**
18:16
**shut (1)**
31:6

**side (2)**
19:13 83:25
**sign (3)**
3:6 97:12,15
**signature (3)**
97:8,15,22
**signed (19)**
3:13 32:17 33:4
33:22,25 34:3
34:5,6,7,8,17
77:24 78:2
79:11,16,18,19
80:2 95:12
**similar (8)**
11:13 65:13,14
65:23,25 66:10
67:1 88:24
**simple (2)**
22:6 60:6
**simply (1)**
62:6
**single (2)**
54:17 66:6
**sink (1)**
60:7
**Sir (5)**
32:19 35:4
38:20 40:24
54:3
**sit (4)**
33:1 34:16
72:21,25
**six (4)**
19:1 81:9,10
82:17
**sleeping (4)**
36:20 48:6
59:10,14
**sleeps (1)**
36:13
**slide (1)**
60:17
**slipped (1)**
76:25
**slips (1)**
69:25
**slow (2)**

14:3 64:8
**soccer (2)**
28:14 41:17
**sold (2)**
11:13,23
**solemnly (1)**
4:5
**somebody (15)**
38:10 46:20,24
47:5 60:7,14
69:19 76:20,24
83:12 85:4
93:9,14,15,21
**someone's (1)**
48:3
**sorry (13)**
11:20 19:5
20:15 29:19
31:6 33:9
34:24 44:19
61:21 68:4
75:5,15 88:20
**sort (1)**
66:23
**sound (1)**
18:11
**source (2)**
8:17,20
**Southeast (2)**
2:9 97:3
**SOUTHERN ...**
1:1
**speak (7)**
15:1,1,5 25:11
25:11 80:13
89:6
**speaking (1)**
11:11
**special (3)**
6:12,24 66:1
**specifically (4)**
41:1 53:23
77:17 92:4
**specify (1)**
63:16
**speeches (2)**
14:6,6

**spent (2)**
15:14,16
**split (3)**
5:6,10,12
**sport (36)**
11:20 25:23
28:4 42:12,13
42:15,16,19,22
42:25 43:9,14
44:9,14,21,24
45:3,7,18 46:2
46:12,18,22
47:11,22 54:18
54:24 55:4,7
57:15 59:9,16
76:22 78:25
80:11 92:19
**sporting (1)**
41:15
**sporting-use (1)**
47:3
**sporting-walk...**
47:5
**sports (10)**
25:5,9 29:9
53:25 54:4,5
68:11,12,14
92:11
**springboard (1)**
66:2
**springboards ...**
65:25,25
**springs (1)**
66:22
**stamps (2)**
32:9 88:19
**stand (1)**
79:17
**star (2)**
24:15,17
**start (2)**
7:22,23
**started (4)**
37:14 38:11
60:16 64:3
**starting (1)**
15:23

**starts (2)**
38:20 75:11
**state (7)**
4:16 7:6 72:18
90:21 95:2,23
96:3
**stated (5)**
71:13 72:18
74:16,19 98:23
**statement (6)**
11:1 13:13 57:5
59:25 73:17
76:10
**statements (3)**
12:14,19 27:17
**states (4)**
1:1 38:9 87:15
90:20
**stating (1)**
80:2
**staying (1)**
43:8
**Stein (12)**
1:13 3:3,11 4:11
4:18,19 95:9
96:8 97:2,25
98:3,25
**stenographic (1)**
96:11
**stenographica...**
1:24 96:8
**Stephen (2)**
2:11 97:2
**STEWART (1...**
2:3,5 3:3 4:15
11:8 13:4 18:5
18:24 19:4,9
20:1 23:12
25:6,13 27:15
30:19 31:8
32:2,5,8,12
33:8,19 34:21
36:19 38:7,19
39:5,17,21
40:23 41:6,20
43:4,21 44:15
45:6,13,16,22

46:15 47:1
48:1,8,19 49:1
49:13 50:5,14
51:1,14,23
52:2,8,11,18
53:2,13 54:2
55:9 56:8,12
57:12 58:16
59:19 60:23
61:22,24 62:17
64:4 65:5,21
66:13 67:4,16
67:23 69:13
70:9 73:7,15
73:24 75:20
77:10 78:5,14
80:7,18,24
89:7,13,19
90:3 91:15
92:16,25 93:2
93:20 94:1,6,9
**stick (3)**
40:19
**stickies (2)**
22:22 30:7
**sticky (12)**
23:22,25 25:3
25:14 26:2,7,9
26:19 30:8,13
34:22 38:8
**stockbroker (1)**
8:7
**stop (2)**
60:12,25
**stopped (1)**
60:18
**street (2)**
8:8 44:14
**strict (1)**
71:18
**strictly (6)**
52:5,22 53:9,17
54:10 67:6
**strike (3)**
33:2 45:14
54:23
**strong (1)**

69:1
**stronger (2)**
27:14 90:24
**stuff (1)**
72:9
**subject (5)**
8:20 18:23 19:2
  49:12 70:7
**sued (3)**
81:20 82:10
  86:5
**sufficient (1)**
17:24
**suggest (1)**
79:8
**suggested (1)**
74:3
**suicide (1)**
88:2
**suit (1)**
90:10
**Suite (2)**
4:21 97:19
**Suites (1)**
1:17
**summary (2)**
13:14 56:6
**super (3)**
25:16,19,25
**supervised (1)**
66:7
**supplemental ...**
34:4,7 38:10
  90:6
**supplied (2)**
20:6,10
**supposed (5)**
11:5 81:13
  82:16 84:21
  86:6
**sure (10)**
7:21 12:10
  13:19,23 24:1
  46:7 57:11
  73:5 79:4 81:3
**surplus (2)**
6:24 7:1

**swam (2)**
61:14,25
**swear (1)**
4:5
**swim (1)**
43:12
**swimming (28)**
25:21 29:14
  41:10,16,19,22
  42:8,11,13,15
  42:21 44:2,5
  44:14 46:1
  53:23 54:6,23
  57:3 62:6 66:7
  74:3,15,17,20
  93:15,21,22
**swing (1)**
66:14
**sworn (2)**
4:12 95:10
**Systems (3)**
1:25 95:22
  96:25

———————— **T** ————————
**tag (1)**
29:17
**tagged (5)**
26:12,17 29:8
  29:10 59:23
**take (10)**
8:25 10:1,2,5
  40:15 52:13,19
  72:6 94:12
  97:7
**TAKEN (1)**
98:3
**takes (2)**
8:24 52:20
**talk (4)**
43:24 59:20
  62:18 92:4
**talked (1)**
89:21
**talking (6)**
31:16 55:24
  74:2 82:5

88:11 91:2
**talks (1)**
36:6
**taxation (1)**
9:10
**teams (1)**
42:1
**tell (8)**
22:23 32:23
  35:5 38:23
  49:22,25 50:9
  55:25
**telling (1)**
46:9
**temporarily (1)**
67:18
**ten (1)**
9:1
**tent (1)**
36:14
**term (19)**
6:9,18 30:15
  35:17 36:3
  42:16 47:21
  63:12 68:8,17
  69:9,10 70:25
  75:3,22 78:22
  80:9,11,21
**termed (5)**
61:15 69:21
  70:25 93:4,16
**termination (1)**
24:21
**terming (1)**
64:9
**terms (13)**
6:19 8:6 27:25
  28:2 44:8
  52:13 54:9,10
  60:3 76:10
  79:23 82:16
  87:20
**terrible (3)**
57:14 85:7,8
**terribly (1)**
83:15
**test (4)**

9:17,24,25 10:1
**testified (13)**
4:13 55:22
  81:21 83:3,16
  83:17 84:14,23
  85:11,15,22
  86:10 87:5
**testify (3)**
82:18 85:10
  86:21
**testifying (1)**
74:11
**testimony (2)**
4:6 80:25
**tests (1)**
10:1
**Thank (2)**
16:1 35:8
**theater (1)**
65:25
**thick (1)**
66:22
**thing (9)**
13:6 16:22 72:3
  80:20 81:10
  88:12 89:1,4,9
**things (16)**
4:25 9:18 10:14
  10:19 19:21
  26:17 45:11
  69:18,20 71:2
  71:18,20,22
  72:23 77:14
  78:20
**think (36)**
17:24 19:12
  21:19 22:17
  23:6 25:10
  37:1 39:12
  40:21 41:13,14
  42:13 45:24,25
  47:4 50:6,10
  52:9 55:11
  63:9 68:9 72:3
  72:23 76:9
  77:3 79:10,16
  80:13 82:14,14

85:6 91:2,11
  91:23 92:1,25
**thinking (3)**
6:5 9:6 29:22
**third (4)**
10:6 24:10,13
  82:7
**thought (7)**
15:14,20 31:24
  71:15 74:7
  78:19 88:20
**three (9)**
9:15,25 10:4
  28:7,8,11
  39:19 52:20,20
**throw (1)**
71:25
**thumb (2)**
20:7 22:19
**thumbnail (1)**
20:4
**Tiara (1)**
84:1
**tight (2)**
70:20 71:13
**time (31)**
3:10 5:5 6:20
  8:3,7 9:23
  14:13 15:13,16
  15:24 18:6
  27:5,22 29:13
  39:9 40:15
  42:23 43:8
  48:3 49:21
  61:12 66:6
  74:4,4,9,22
  76:3 81:9
  90:11,23 97:8
**times (2)**
16:13 58:21
**titled (1)**
30:6
**today (11)**
11:6 12:4,8,9
  15:17 19:7
  34:16 72:22,25
  74:11 92:9

**TODD (2)**
2:3,5
**Todd@TrialC...**
2:6
**told (3)**
32:22 56:9
58:14
**total (1)**
18:6
**touching (1)**
54:21
**tough (1)**
39:9
**trampoline (7)**
26:20,22 27:2,2
88:16 92:9,18
**trampolines (3)**
11:24 88:6,23
**transcript (6)**
48:17 96:10,10
97:10,11 98:1
**transition (1)**
60:17
**traverses (1)**
57:25
**treading (1)**
42:24
**tremendous (1)**
84:19
**trip (5)**
38:16 39:1,2,2,3
**trips (2)**
38:12 69:25
**trouble (1)**
12:13
**true (7)**
40:24 55:13
67:5 80:19
93:5 96:11
98:23
**truly (1)**
97:17
**truth (3)**
4:7,7,8
**trying (6)**
5:23 35:6 37:13
47:5,19 63:18

**Tuesday (1)**
1:16
**turn (1)**
81:1
**turning (1)**
21:8
**twice (3)**
26:12 89:4,9
**two (12)**
4:25 7:3 9:20
12:24 13:16
17:16 24:1,6,8
27:17 34:7
88:5
**type (7)**
5:21 7:10 64:25
66:25 71:2
76:11 94:4
**types (4)**
5:19 9:20,21
77:14
**typically (6)**
6:16,24 9:15
15:18 58:3
71:22

_____
**U**
**ultimately (5)**
9:17 27:1 77:1
84:9 87:24
**unable (1)**
77:24
**unbelievable (1)**
85:6
**unclear (6)**
50:3,4,21 51:18
51:21 69:9
**undersigned (1)**
95:8
**understand (12)**
27:4,6 36:3
42:16 51:11
52:7 53:4,6
64:14 86:17
88:14 91:6
**understandin...**
12:14 42:19

55:15 71:12
72:19 75:24
**understood (2)**
35:20 68:25
**Underwriter (1)**
8:22
**underwriting ...**
3:14 16:10 30:6
32:1,3,15 37:3
**unfortunate (1)**
92:21
**unfortunately ...**
26:15 32:10
69:22 77:4
85:20 86:15
**United (3)**
1:1 38:9 87:15
**units (2)**
82:9,11
**University (1)**
8:1
**unquote (2)**
62:7 65:13
**unsigned (5)**
32:18 33:16,21
38:9 79:9
**upside (2)**
24:3 40:21
**USA (1)**
85:21
**USAA (1)**
85:17
**use (18)**
20:7 48:21 62:8
62:14 64:8
65:17,25 66:6
69:1,9,10
75:22 80:11,21
93:11,17,23
94:9
**USLI (7)**
30:9,10 33:15
34:25 37:22
40:2,13
**utilize (1)**
66:2

_____
**V**
**v (1)**
3:12
**various (2)**
5:16,19
**vaulting (1)**
65:24
**Velcro (1)**
66:1
**Ventnor (1)**
86:18
**Vernon (26)**
1:8 3:12 13:14
22:13 33:15
40:13,25 43:16
48:20 52:23
53:17,20 54:6
54:11 56:17
76:12 80:8,13
88:5 89:24
90:7 91:7
92:12,22 97:6
98:2
**Vernon's (1)**
91:9
**version (1)**
15:19
**versus (2)**
81:12,13
**Village (1)**
86:20
**volunteers (1)**
74:2
**vs (2)**
97:6 98:2
**vs- (1)**
1:7

_____
**W**
**wah-wah-wah...**
66:24
**wait (1)**
33:10
**waiting (1)**
85:7
**waive (3)**
97:8,15,22

**walk (3)**
47:3,9,20
**walking (16)**
44:13 46:1,10
46:11,17,20,24
47:15 54:22
55:2,4,6 59:6,7
59:14 60:16
**wall (2)**
8:8 66:4
**Wall/Human (...**
66:1
**want (18)**
7:22,24 18:15
29:2 33:15
34:12 57:8
59:24 72:22
73:18,18 78:17
79:5 81:5
84:20,21 89:22
94:4
**wanted (12)**
24:20,25 40:25
41:10 43:16
46:7 48:20
69:5,5 79:24
80:14 87:25
**Washington (2)**
8:1,2
**wasn't (4)**
27:2 62:2 76:18
84:20
**water (28)**
30:16 31:13,17
31:18 35:15,17
35:21,22,23
36:3 37:15
42:23,24 43:8
43:8 54:22
55:3 59:20,25
60:3,4,7 77:20
79:10,21,23,24
80:3
**way (16)**
6:10 12:3 23:2
25:2,6 26:17
27:9 29:24

31:22 37:20
41:23 44:18
49:15 63:23
64:6 88:9
**we'll (6)**
18:1 39:18
40:12 43:6
94:3,12
**we're (14)**
7:10 13:11
17:24,25 18:18
24:23 26:13
55:24 70:10
72:11 75:5
82:5 88:11
91:2
**we've (2)**
19:22 92:8
**weakest (2)**
27:10,13
**weight (1)**
47:5
**weird (1)**
57:9
**welcome (3)**
89:22 90:16
91:3
**went (9)**
7:21,24 8:1
24:11 36:8
47:9 80:15
87:19 93:22
**West (3)**
1:2 2:4 97:19
**whatsoever (3)**
11:7 25:1 60:6
**WHITE (2)**
2:8 97:3
**wholesale (8)**
5:17 6:7,21,25
37:24,25 81:12
81:24
**wholesaler (3)**
87:11,12,13
**wholesalers (1)**
6:19
**Wild (1)**

36:18
**Wilkie (1)**
83:23
**windstorm (4)**
83:2 84:5,18,19
**wish (1)**
97:15
**withdraw (4)**
78:6,11 79:5
80:4
**witness (13)**
3:2,6,13 4:9 5:2
5:7,9 7:17
73:20,22 75:9
75:13 98:3
**witnesses (2)**
73:13 74:13
**Woods (1)**
81:23
**word (8)**
39:6,9 42:19
47:3 60:19
63:21 77:17
81:5
**words (7)**
22:22 29:1,2
31:18 53:22
54:4 91:23
**work (7)**
5:17 6:15 7:17
62:24 86:6
87:19 90:11
**workers' (1)**
82:1
**working (1)**
8:7
**works (1)**
58:4
**worth (1)**
87:14
**wouldn't (7)**
27:13 32:18
40:8 50:2 79:5
79:18 93:23
**wrapped (2)**
83:22 84:9
**write (6)**

7:14 16:13,13
39:2 46:8 98:1
**writing (1)**
29:22
**written (16)**
12:14 29:24
41:1,4 44:18
48:22 51:7,8
51:10,24 53:19
54:16 68:24
69:8 70:24
89:4
**wrong (4)**
45:24,25 52:8
78:19
**wrote (6)**
13:25 15:4
16:12 17:16
25:20 92:1

_____
**X**
_____
**X (2)**
22:24 71:7

_____
**Y**
_____
**yeah (3)**
19:20 32:2 37:6
**year (3)**
7:15 21:20
83:14
**years (16)**
5:1,2 7:13,16,18
9:1 27:20
49:24,25 68:25
81:10,10 82:17
83:23 85:8
86:8
**yellow (2)**
23:3,3
**Yep (1)**
14:21
**York (2)**
8:8 83:24

_____
**Z**
_____
**zip (39)**
27:1 40:25 41:1

55:17,20,23
57:2 58:8,23
61:2,5,8,9,14
61:17 62:3,7,8
62:8,13,14,19
63:12,24 64:6
65:1 72:20,24
73:6,9,14 76:1
93:4,5,6,9,12
93:17,22
**zip-lining (20)**
57:6,15,20,23
57:24 58:4,6
58:11,14,15
59:1,3 60:24
60:25 61:11
63:23 74:4,14
74:22 76:5
**zoo (1)**
39:4

_____
**0**
_____
**03/17/15 (1)**
3:11
**07/07/2015 (1)**
98:3
**091862 (1)**
95:24

_____
**1**
_____
**1 (4)**
3:10 18:1,2 96:9
**1.5 (1)**
18:11
**1:00 (4)**
1:16 4:2 17:13
17:19
**1:15 (1)**
16:24
**1:30 (3)**
16:5,9 17:8
**1:45 (1)**
16:5
**10 (5)**
18:19 21:21,22
22:5 84:14
**10:00 (2)**

17:3,13
**10:15 (1)**
17:3
**10:30 (2)**
16:11 17:7
**100 (3)**
2:9 73:5 97:3
**100,000 (2)**
81:17,18
**11 (6)**
20:13,17 21:10
21:12 84:13,15
**11:00 (3)**
16:5 17:10,19
**11:15 (2)**
16:11 17:13
**11:30 (4)**
16:5,9,11 17:7
**11:45 (1)**
16:14
**12 (4)**
19:19 20:15
84:17,18
**12:00 (4)**
16:9,15,25
17:10
**12:30 (1)**
17:1
**120,000,000 (1)**
84:5
**12th (2)**
2:9 97:4
**13 (1)**
20:20
**1375 (1)**
1:18
**14 (2)**
20:21 85:14
**14th (3)**
95:12 96:18
97:1
**15 (5)**
5:1 20:22 58:20
83:23 85:19
**16 (5)**
20:23 26:3 86:3
86:4 90:6

**1615 (1)**
97:19
**17 (3)**
18:10 21:7
86:15
**18 (1)**
3:10
**18-month (1)**
9:16
**19 (2)**
3:11 87:3
**1984 (1)**
8:3
**1993 (4)**
8:10 11:13
27:20 42:18
**1D (1)**
90:7

_____
**2**
**2 (8)**
3:11 18:10,11
19:24,25 68:2
72:12 75:1
**2-15 (1)**
7:7
**2-18 (1)**
7:7
**2-20 (2)**
7:4,11
**2:00 (3)**
16:7 17:10,13
**2:15 (1)**
16:24
**2:30 (1)**
17:13
**2:45 (2)**
16:7 17:11
**20 (1)**
27:20
**2000 (3)**
7:15,16 9:3
**2011 (3)**
34:23 37:6
89:20
**2015 (7)**
1:16 20:11

95:10,12 96:18
97:1,7
**21 (1)**
87:22
**22 (1)**
49:24
**22.5 (1)**
18:10
**23 (4)**
20:11 27:21,22
49:24
**250 (1)**
90:11
**28 (3)**
34:23 37:6
89:20

_____
**3**
**3 (4)**
3:14 13:24
39:20 70:19
**3/26/15 (1)**
16:2
**3/27/15 (1)**
16:4
**3/29/15 (1)**
16:8
**3/30/15 (2)**
16:10,17
**3:00 (4)**
16:9 17:8,11,13
**3:15 (2)**
16:2,21
**3:21 (2)**
1:16 94:15
**3:30 (3)**
17:11,13,19
**3:45 (1)**
16:21
**30 (1)**
97:12
**300 (1)**
18:14
**33394 (2)**
2:10 97:4
**33401 (1)**
97:19

**33426 (1)**
1:18
**33431 (1)**
4:22
**33458 (1)**
2:4
**35 (1)**
5:7
**39 (1)**
3:14
**3rd (2)**
2:9 97:3

_____
**4**
**4 (15)**
3:3,16 13:25
14:5 23:22
40:12,22 72:12
75:1,6,7 77:19
77:20 79:2
82:23
**4/23/15 (1)**
16:19
**4/24/15 (1)**
16:22
**4/4/2018 (1)**
95:25
**4:00 (2)**
17:5,14
**4:15 (3)**
16:3 17:5,14
**4:45 (1)**
17:14
**40 (1)**
3:16

_____
**5**
**5 (6)**
14:2,9 23:21
24:1 78:8
82:25
**5/21/15 (1)**
16:25
**5/22/15 (1)**
17:2
**5/30/15 (1)**
17:4

**50/50 (1)**
5:12
**500 (1)**
97:19
**509 (1)**
4:21
**5550 (1)**
4:21
**561.743.2002 (1)**
2:5

_____
**6**
**6 (5)**
14:17 24:13
78:21 83:7,8
**6/14/15 (1)**
17:12
**6/2/15 (1)**
17:6
**6/3/15 (1)**
17:9
**6:15 (1)**
17:14
**6:45 (1)**
17:14
**65 (2)**
5:6,13
**68 (1)**
13:12
**69 (1)**
13:12

_____
**7**
**7 (5)**
1:16 14:22 26:3
81:1 83:10
**7/2/15 (1)**
17:15
**7/6/15 (1)**
17:18
**7th (2)**
95:10 97:7

_____
**8**
**8 (3)**
15:11 83:20
90:6

**824 (1)**
2:4
**88316/Mount ...**
3:12

_____
**9**
**9 (4)**
15:13 18:19,20
83:22
**9:00 (1)**
17:18
**9:15-CV-8007...**
1:2 97:6 98:2
**93 (1)**
9:4
**95 (1)**
3:5
**954.377.8107 (1)**
2:10
**96 (1)**
3:5
**97 (1)**
3:6
**98 (2)**
3:6 96:9